McCALEB, Justice.
 

 On May 28th 1951, appellant, Gulf States Utilities Company, filed an application with the Louisiana Public Service Commission for authority to increase its rate for electric utility service in the state of Louisiana by 20% which, it alleged, would provide it with a rate of return on its depreciated investment of less than 6%% per annum. In due course, an examination of the corporation’s affairs in Louisiana was made by the Commission’s staff and, following a formal hearing, the Commission handed down a written opinion (Order No. 5931) on February 15, 1952, denying the application in its entirety.
 

 Proceeding under LSA-R.S. 45:1192 and Section 5 of Article 6 of the Constitution, appellant filed a petition in the Nineteenth Judicial District Court for the Parish of East Baton Rouge (the Commission’s domicile) for a review of the adverse order. There, ■ after trial, the relief sought was denied and appellant’s petition dismissed. Wherefore this appeal.
 
 [1]
 

 Appellant is a public utility corporation organized under the laws of the State of .Texas with its domicile in the City of Beaumont. It is authorized to do business in Louisiana and furnishes electric power and water to the public in various cities, towns, villages and rural sections in 19 parishes of this State. Besides this, appellant sells to Esso Standard Oil Company and Ethyl Corporation, two large industrial concerns whose plants are contiguous to appellant’s Baton Rouge station, a special type of steam-electric service which consists of supplying, through seven generators, a combination of processed steam and by-product electric energy. Supplying
 
 *137
 
 this service, which is rendered by virtue of private contracts with the mentioned corporations, forms a substantial part of appellant’s business in Louisiana, approximately 22% of its total plant investment being devoted to' this purpose.
 

 Appellant maintains, and the record reveals, that its application for a rate increase emanated from the combined impact of inflated costs and the urgency for extraordinary expansion of its services. Between 1945 and 1951, its material costs advanced 64% and wages 93%, yet appellant has not heretofore sought a rate increase. However, due tO' the rapid postwar growth and development of the area it serves, it was vital to appellant’s business to greatly expand its normal electric services, its peak load in Louisiana having increased 178% since 1945. To keep pace with this fast development, appellant added over $10,000,000 to its electric plant in 1951 and has planned further expansion for 1952 and 1953 costing $22,000,000.
 

 It is shown by appellant that, despite the increased business, the rate of return on its investment decreased in 1950 to approximately 5% and that there would be a further decrease in 1951 to 4.27%. It contends that this return is far below the percentage necessary for an overall efficient operation of its business; that it does not constitute a just and reasonable return and that it is entitled to a rate which will produce 6%% on its depreciated plant investment, calculated on the formula adopted by the Commission in the case of Louisiana Public Service Commission v. Louisiana Power & Light Company, 65 P.U.R., N.S., 18.
 

 As stated above, the staff of experts of the Commission made an independent investigation of appellant’s rate base, using the formula employed by the Commission since 1946, Louisiana Power & Light Co. case, supra, of 6% on gross plant less 5%% on depreciation reserve. By this method, the staff’s figures revealed that the return on appellant’s normal electric operations in Louisiana was 5.04% in 1950 and would decrease to 4.35% in 1951
 
 [2]
 

 Thus it appears that there is no substantial difference in the rate of return calculated by appellant and that of the Commission’s Staff — so, for convenience in our discussion of the case, we shall accept the computations of the Commission’s Staff which show a slightly larger rate of return.
 

 Based on its own computations, the Commission’s Staff also figured that a rate increase of 21.23% would be required in order to give appellant a rate of return of 6% on gross plant less 5^% on depreciation reserve. However, as these calculations of appellent’s rate base did not
 
 *139
 
 take- into consideration its steam-electric business on which it received a return of 7.17% in 1951, the staff made another ■compilation of the entire investment. By ■combining the returns from the steam-electric business and making certain other adjustments,
 
 [3]
 
 it was determined that appellant’s rate of return for the year 1951 would be 5.11%.. But, even on these figures, an increase of 15.65% in rates would be required in order to give appellant a 6% return on its investment.
 

 In approving the inclusion of appellant’s steam-electric business as part of its public utility service, despite appellant’s protest that this was the sale of a different sort of power based on independently negotiated contracts, the Commission stated that there were similar situations existing in New Jersey and California; that the Public Service Commissions of those states had assumed full jurisdiction over such "package sales” and that the operating results were not segregated from those of the general utility operation.
 
 [4]
 
 And the Commission resolved that, since appellant was receiving a return of over 5% on its combined steam-electric and general utility business, an increase in its rate was not in order; that its application was likely to be premature as 1951 might prove to be a nontypical year of operation; that, in any event, appellant’s present earnings were substantial and that it had never considered that a return of less than 6% was confiscatory.
 

 The district judge agreed with the Commission that appellant’s rate of return was in excess of 5%; that, therefore, it was not confiscatory and that appellant had failed to discharge its burden of showing that the ruling of the Commission was arbitrary, and unreasonable.
 

 We do not subscribe to the views of either the Commission or the trial judge. Initially, the issue for decision *in rate cases is whether the rate fixed is “reasonable and just” and therefore within the
 
 *141
 
 power and authority conferred upon • the Public Service Commission by Section 4 of Article 6 of the Constitution.
 
 [5]
 
 Morgan’s L. & T. R. & S. S. Co. v. Railroad Commission, 127 La. 636, 53 So. 890. And, to hold that a rate is unjust or unreasonable, it must be found that the action of the Commission was arbitrary or capricious — that is, that the decision was either plainly contrary to the facts or unsupported by evidence, bearing in mind, of course, that the rulings of the Commission, like those of other administrative bodies acting under a delegation of discretionary authority, are entitled to great weight and will not be disturbed in the absence of a clear showing of abuse- of power. Burke v. Louisiana Public Service Commission, 215 La. 451, 40 So.2d 916 and cases there cited.
 

 In arriving at the conclusion that the rate of return of 5.11% was fair and just, the Commission stated that its' rulings in previous cases involving rates would reflect a consistency of attitude that no raté 0-f return in excess of 6% was in the public interest and that this did not neces-' sarily mean that a rate of less than 6% was unreasonable. Indeed, it reiterated that it had reasoned in the Louisiana Power & Light Company case that the rate" of return to be. allowed was not to be
 
 &
 
 static fixed percentage of the plant investment, but that the rate in.each individual case would be determined from evidence as to the efficiency of the operation and other factors.
 

 While it is true that the Commission in the Louisiana Power & Light Company casé did not fix an exact ratio or return applicable to all cases, the fact remains that 6% of the gross plant less 51/3% on depreciation reserve was set forth as the allowed percentage on which a fair rate of return was evaluated. Albeit, an examination of the Commission’s records, beginning with its adoption of the “prudent investment” theory
 
 [6]
 
 in the Louisiana Public Service Commission case, will show that it has invariably, for over a period of six years and in 29 cases in which it has fixed rates, allowed a return of 6% in matters of this sort. Hence, if
 
 6%
 
 is and has been considered by the Commission to be a just and equitable rate of return, it would seem that refusal to grant an applicant a rate increase which would enable it to earn 6% would be inequitable • and
 
 *143
 
 unjust in the absence of exceptional circumstances.
 

 It would, therefore, ordinarily follow that, since appellant’s rate of return on the figures of the Commission’s own experts was only 5.11%, its denial of any rate increase at all was somewhat discriminatory, in view of its allowance to other companies engaged in the same calling of a rate sufficient to produce
 
 6%.
 
 The Commission’s explanation that the year 1951 is not typical of appellant’s business and that, therefore, its application is likely to be premature does not appear to be on sound footing. Obviously, the statement, that 1951 is not a typical year, is purely conjectural; as a matter of fact, appellant sustained a reduction below 6% in its rate of return in 1950. And it cannot rightly be said that the application was premature in the face of appellant’s declining returns. That excuse is unrealistic because the Commission retains its authority over the utility and is in a position to reduce the new rate in case appellant’s return exceeds 6% in its future operations.
 

 On the other hand, if we consider the action of the Commission to be not without justification — in that it probably felt that the difference between 5.11% earned by appellant in 1951 and the allowable 6% was not substantial enough to warrant a raise in electric charges at this time — then it becomes important to determine whether the Commission was correct in including the steam-electric business in computing the return on appellant’s investment in the public utility business. As aforesaid, without the steam-electric business, the rate of return on appellant’s normal utility investment for the year 1951, according to. the Commission’s own experts, would be only 4.35%.
 

 That t'he Commission erred in holding the steam-electric enterprise to be a public utility, inseparable from the ordinary electric service business operated by it, we have no dou'bt. The evidence shows that Standard Oil Company and Ethyl Corporation, by separate contracts with appellant, are supplied with a specialized type of steam-electric energy.
 
 [7]
 
 The steam-electric energy is a combination of steam and electricity which is used in a process for refining oil or in the production of other commodities. It is produced by seven generators and, while it is possible to generate electricity from these machines for normal lighting purposes, it would be an inefficient operation as they were designed and operated for the sole purpose of producing this highly specialized form of energy. In essence, the process consists of passing great quantities of steam through specially designed steam turbine.
 
 *145
 
 generating equipment
 
 [8]
 
 which, uses about 30% of the possible energy of the steam and passes it, with such electricity as is generated, on to the consumer plant as a “package unit”. The generators are housed in a plant which also contains two of plaintiff’s regular generators but they are operated as entirely separate units. It therefore seems patent that, inasmuch as this special type of business is devoted to a particular purpose under separate contract 1 with private corporations, it cannot be said to be a utility dedicated to public use.
 

 In determining whether a particular business is or has become a public utility, investigation of its characteristics is essential. If its operator does not profess to perform the service to all who require it, the business cannot be regarded as a public utility. Where the operator engages in a single pursuit little difficulty is encountered in fitting the business into its proper classification but, in instances like this, where the operator is engaged in more than one endeavor and the greater portion of the business is devoted to- public use, it is not always easy to draw a clear line of demarcation. . However, in view of the special nature of the service rendered by appellant under its contracts with the two refineries, we think it clear that its steam-electric business is, and was always intended to be, a private enterprise separate and apart from the normal utility service it renders the public.
 

 The trial judge was of the opinion that the Commission rightly included the returns of appellant’s steam-electric business in computing the rate of return to> be allowed on its public utility investment because Section 4 of Article 6 of the Constitution, in defining the power, authority and duties of the Public Service Commission, declares, among other things, that it “shall affect and include all matters and things connected with, concerning, and growing out of the service to be given or rendered by the common carriers and public utilities # *
 
 »
 

 We cannot see that this provision grants or is designed to give the Commission power over private pursuits in which a public utility may become engaged when it is authorized to' do so by its charter. The language of the Constitution extends the authority of the Commission only to those things connected with and “growing out of the service” meaning, of course, the public service rendered by a common carrier or a utility — obviously not those things which are not connected with or which do not affect the furnishing of such service. Thus, in a case where a public
 
 *147
 
 utility engages in an unprofitable private business with the result. that it places a burden upon the utility business, it may be proper for the Commission to regulate the venture to a limited extent so that it will not be harmful to the public interest.
 
 [9]
 
 But no such situation is presented in this case. Indeed, the Commission is actually taking the benefit of the substantial earnings of appellant's private steam-electric business and using it in its computation so as 'to enhance the rate of return ’ produced by the normal public utility enterprise. To permit this is to force the private pursuit to subsidize the public one. Manifestly, this cannot be countenanced.
 

 With tihe elimination of appellant's steam-electric business from consideration, ■the rate of return from the public utility ■investment is 4.35%. And, according to "the Commission’s Staff, a 21.23% raise in its electric rates will be required in order for appellant’s earnings to produce a rate of return of 6%. Appellant asks for only a 20% increase — to which we think it is unquestionably entitled.
 

 For the reasons hereinabove given, the judgment appealed from is reversed, the Order No. 5931 of the Louisiana Public Service Commission is annulled and set aside and appellant is hereby authorized to increase its rates and charges for electric utility service by 20%, as prayed for.
 

 [1]
 

 . Appellate jurisdiction is vested here by specific provision of Section 5 of Article 6 of the Constitution.
 

 [2]
 

 . These figures for 1951 were based on 7 months actual and 5 months anticipated operations.
 

 [3]
 

 . Appellant contests the correctness of some of these adjustments made by the Commission Staff. However, in view of the decision we have reached,' the adjustments are of no consequence and, hence, discussion of appellant’s contentions concerning them would be superfluous.
 

 [4]
 

 . On the other hand, the Commission singularly omits mention of the fact that it had never theretofore taken appellant’s steam-electric business into account in fixing its rates.
 

 The Commission also stated, in ruling that inclusion of the steam-electric business was proper,
 
 that it
 
 was difficult
 
 to
 
 segregate it appropriately from the normal utility operations and that such segregation is not in the public interest. The answer to this is that the Commission’s Staff had no difficulty .in separating these operations. Moreover, if the steam-electric business is private, the Commission is without power to control it.
 

 [5]
 

 . If the rate is confiscatory, it offends Section 2 of Article 1 of our Constitution and the Fourteenth Amendment to the Constitution of the United States as well as Section 4 of Article 6 of our Constitution — for it operates as • a taking of property without adequate compensation and due process of law.
 

 [6]
 

 . See Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 64 S. Ct. 281, 88 L.Ed. 333.
 

 [7]
 

 . Another company, formerly supplied, by appellant, owns and operates such a generating unit for itself.
 

 [8]
 

 . The fuel for the equipment is supplied by Esso. Under the contracts, appellant is required to receive from Esso, and utilize as fuel, certain burnable but non-merchantable waste residues from its refinery operations, in addition to the regular fuel.
 

 [9]
 

 . The authority of the Public Service Commission in such a case might be sustained on the theory that, although the business is p2’ivate, it
 
 becomes .connected
 
 with the public business of the operator when it injuriously affects it.