130 So.2d 652

**UNITED GAS PIPE LINE COMPANY**

v.

**LOUISIANA PUBLIC SERVICE COMMISSION.**

No. 45485.

May 29, 1961.

Jack P. F. Gremillion, Atty. Gen., Joseph H. Kavanaugh, Sp. Counsel, Alvin J. Liska, City Atty., Robert A. Ainsworth, Jr., Baldwin, Haspel, Molony, Rainold & Meyer, Lawrence A. Molony, Lawrence J. Molony, Conrad Meyer, III, New Orleans, Dallstream, Schiff, Hardin, Waite & Dorschel, Robert S. Hunt, Chicago, Ill., Joseph H. Hurndon, Asst. City Atty., New Orleans, for appellants and intervenors-appellants.

C. Huffman Lewis, John M. Madison, Vernon W. Woods, E. J. Freiberg, Saunders Gregg, Willis L. Meadows, Shreveport, for appellee.

SANDERS, Justice.

This is a gas utility rate proceeding instituted by the United Gas Pipe Line Company. It is before us on an appeal by the Louisiana Public Service Commission and various intervenors from a judgment of the Nineteenth Judicial District Court fixing the rate of return for the intrastate operations of the company in the New Orleans zone at 6% and adjusting the cost of service, thereby reversing in these respects Order No. 8061 of the Commission issued on March 25, 1960. The appeal is answered by United who seeks a further increase in the rate granted by the district court.

The United Gas Pipe Line Company is a wholly-owned subsidiary of United Gas Corporation. It is engaged in the business of purchasing natural gas, transporting it through pipe lines, and selling it to distributors and industries. Its pipe line system extends into the states of Louisiana, Texas, Mississippi, Alabama, and Florida.

United purchases gas from producers in several states but principally in South Louisiana and South Texas. Each of these areas produces more gas than is required for local consumption. So vast is the quantity of gas produced in these areas that most of the major pipe lines, which serve all parts of the United States, originate here.

All of the gas sold by United in the New Orleans zone is produced in South Louisiana. Other gas, likewise produced in South Louisiana, is transmitted through the pipe lines traversing the New Orleans zone to interstate markets elsewhere.

In recent years the field price of natural gas has spiralled. This has resulted from the increase in number and size of long distance pipe lines, the rapidly expanding use of gas, and the aggressive competition in its purchase by the companies engaged in its transmission and sale.[1]

On April 29, 1959, United filed its application with the Louisiana Public Service Commission for a rate increase contained in two schedules applicable to sales of natural gas in the New Orleans zone: schedule G-NOD available to New Orleans Public Service, Inc. and Louisiana Gas Service Company; and schedule D-NOD available to other natural gas distributors.

Rate schedule G-NOD was composed of two parts: a rate for the sale of gas used for residential, residential space heating, commercial, and commercial space heating purposes (usually referred to as domestic gas); and a rate for the sale of gas to large industrial users.

In the rate schedules, United proposed to increase the rate for domestic gas from

1. See 19 Law and Contemporary Problems 348–350, 364–366.

17¢ per MCF to 21.4¢ per MCF and to increase the rate for large industrial gas from 12¢ per MCF to 19.7¢ per MCF, thereby fixing a price differential of 1.7¢ per MCF between domestic and industrial sales.

The increase sought was an additional $2,947,974 based upon the test year of 1958 as adjusted. It involved an increase in zonal revenues of 41.3%.

A motion of United to make the increased rates effective immediately subject to a refund bond was denied by the Commission.

Petitions of intervention were filed by the City of New Orleans, the Sewerage and Water Board of New Orleans, and a number of gas customers. The Commission allowed the interventions.

After a lengthy hearing and voluminous testimony, the Commission adopted a rate of return of 5.5% on the rate base fixed by it, thereby authorizing an increase in revenues of $1,848,696 or 25.9%.[2] From this order United filed a petition for review in the Nineteenth Judicial District Court pursuant to the provisions of Article VI, Section 5 of the LSA–Constitution and LSA–R.S. 45:1192.

A number of parties filed interventions in the district court. Among them were the Sewerage and Water Board of New Orleans, the Chamber of Commerce of the New Orleans area, and a group of industries. To these interventions United filed exceptions of no right or cause of action. The court maintained the exceptions as to the Sewerage and Water Board of New Orleans and the Chamber of Commerce of the New Orleans area.

The district court rendered a comprehensive judgment based upon a written opinion. It affirmed the order of the Commission insofar as it:

(1) Disallowed a purchased gas cost adjustment clause.

(2) Rejected an adjustment to reflect the changed value of the dollar.

(3) Fixed the price differential between gas sold to domestic users and that sold to large industrial users at 2.75¢ per MCF.

It reversed the order of the Commission insofar as it:

(1) Fixed 5.5% as a fair rate of return. The court increased the rate of return to 6%.

(2) Used a system-wide average cost of gas in establishing the cost of service of United.

From this judgment the defendant, Louisiana Public Service Commission, and intervenors, City of New Orleans, Sewerage and Water Board of New Orleans, and the industrial intervenors have appealed.

2. 34 PUR 3rd 78.

United has answered the appeal praying that this Court increase the rate of return of 6% allowed by the district court to "that fair rate of return required by the law and the evidence." The disallowance of the purchased gas escalator clause and the adjustment to reflect the changed value of the dollar has not been challenged in the answer to the appeal.

◼◼◼◼◼ On appeal only one of the procedural questions presented to the trial court is pressed upon us. It is strenuously contended that the trial court erred in dismissing the intervention of the Sewerage and Water Board of New Orleans. This question stands at the threshold of the case.

As a basis for its intervention, the Sewerage and Water Board of New Orleans alleges these facts: that United serves New Orleans Public Service, Inc., a local distributor of gas in the New Orleans zone; that the Board purchases gas from this distributor to serve its operations in providing the public water supply, sewerage, and drainage system for the Parish of Orleans; that if an increase in gas rates is allowed United, this increase will ultimately be passed on to the Board and will materially increase its gas costs.

Opposing the intervention, United contends that no natural gas is purchased by the Board from United nor is the Board a party to any contract under which United sells natural gas. Therefore, the rate at which the Board purchases gas from New Orleans Public Service, Inc. is not the rate involved in these proceedings, and the Board is without the requisite interest to sustain an intervention.

Testimony of a public accountant, who prepared schedules introduced in evidence, was offered to show the effect of the proposed increase in rate if it were passed on to customers by New Orleans Public Service, Inc.

It has been held that the interest required to authorize intervention must be a direct one by which the intervenor is to obtain immediate gain or suffer immediate loss by the judgment which may be rendered between the original parties. The interest must be closely connected with the object in dispute and founded on some right, lien, or claim, either conventional or legal. Brown & Sons v. Saul, 4 Mart., N.S., 434; Lincoln v. New Orleans Express Co., 45 La.Ann. 729, 12 So. 937; Wells v. Blackman, 121 La. 394, 46 So. 437; Morris v. Municipal Gas Co., 121 La. 1016, 46 So. 1001; Black v. New Orleans Ry. & Light Co., 145 La. 180, 82 So. 81; New Orleans Silica Brick Company v. John Thatcher & Son, 160 La. 392, 107 So. 236; State Board of Medical Examiners v. McHenery, La.App., 69 So.2d 592; New Orleans Land Co. v. Leader Realty Co., 255 U.S. 266, 41 S.Ct. 259, 65 L.Ed. 621; Articles 389, 390 and

391 of the Code of Practice of 1870.[3] See also 67 C.J.S. Parties § 57b, pages 986, 987; 39 Am.Jur. Parties, para. 61, page 935.

As we appreciate the record herein, the rate increase allowed can be passed on to the Board by New Orleans Public Service, Inc. It may eventually be done. But the evidence does not establish that the transference is mandatory. It seems clear that the Board will be affected only if further rate action is taken by New Orleans Public Service, Inc., after the termination of this proceeding. Hence, the interest shown by the Board is remote, indirect, and contingent.

We conclude that the intervention of the Sewerage and Water Board of New Orleans was properly dismissed.

On the merits the contentions advanced by the appellants are variously stated, but they may be subsumed under three major points:

1. The district court erred in rejecting as unreasonable the rate of return of 5.5% on the rate base as fixed by the Commission and increasing the rate of return to 6%.

2. The district court erred in rejecting the system-wide ("rolled in") cost of purchased gas as adopted by the Commission in establishing the cost of service for United.

3. The district court erred in affirming the price differential of 2.75¢ per MCF between domestic and industrial gas fixed by the Commission and rejecting the greater differential of 5¢ per MCF which existed prior to the present rate proceeding.[4]

It is to these contentions that we now address ourselves.

### Rate of Return

■ By constitutional mandate, the appellate review by this Court of orders of the Louisiana Public Service Commission extends to both the law and the facts. Article VII, Section 10, Louisiana Constitution of 1921; LSA–R.S. 45:1192; Vicksburg, S. & P. Ry. Co. v. Railroad Commission of Louisiana, 132 La. 193, 61 So. 199; Southern Bell Tel. & Tel. Co. v. Louisiana Public Service Commission, 239 La. 175, 118 So.2d 372.

■ In rate cases such as this, the issue for decision is whether the rate fixed is "reasonable and just." Article VI, Section 4, Louisiana Constitution of 1921; Gulf States Utilities Co. v. Louisiana Public Service Commission, 222 La. 132, 62 So. 2d 250. In resolving this issue, great weight must be accorded to the ruling of the

---

3. Compare Article 1091, LSA–Code of Civil Procedure.

4. This contention is sponsored by the industrial intervenors-appellants.

Commission. Courts should act slowly in substituting their own views for those of the expert body charged with the legislative function of rate making, a technical field which embraces far-reaching economic policies. The decision of the Commission should not be disturbed in the absence of a clear showing of abuse of power. Burke v. Louisiana Public Service Commission, 215 La. 451, 40 So.2d 916; Gulf States Utilities Co. v. Louisiana Public Service Commission, supra; Illinois Central R. Co. v. Louisiana Public Service Commission, 224 La. 279, 69 So.2d 43; Southern Bell Tel. & Tel. Co. v. Louisiana Public Service Commission, 232 La. 446, 94 So.2d 431; Southern Bell Tel. & Tel. Co. v. Louisiana Public Service Commission, 239 La. 175, 118 So.2d 372.

We are impressed with the fact that we are here dealing with only the apex of the natural gas rate structure. Underlying the rate and basic to it is the well head price of natural gas, which gave rise to this proceeding but which is beyond the scope of this review.

The fixing of rates involves a delicate balancing of consumer and investor interests. In a very real sense, the problem of a fair return is one of economics. It involves the application of a fair rate of return to a fairly constructed rate base.

The guiding principles have been laid down in the case of Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333. There the court said:

"Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. Cf. Los Angeles Gas & Electric Corp. v. Railroad Commission, 289 U.S. 287, 304–305, 314, 53 S. Ct. 637, 643, 644, 647, 77 L.Ed. 1180; West Ohio Gas Co. v. Public Utilities Commission (No. 1), 294 U.S. 63, 70, 55 S.Ct. 316, 320, 79 L.Ed. 761; West v. Chesapeake & Potomac Tel. Co., 295 U.S. 662, 692–693, 55 S.Ct. 894, 906, 907, 79 L.Ed. 1640 (dissenting opinion). It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end * * *.

"The rate-making process under the Act, i. e., the fixing of 'just and reasonable' rates, involves a balancing of the investor and the consumer interests. * * * From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. * * * By that standard the return to the equity owner should be commensurate with returns on invest-

ments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. * * *

"* * * Rates which enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed certainly cannot be condemned as invalid, even though they might produce only a meager return on the so-called 'fair value' rate base." [5]

A classic test of the fair return is found in Bluefield Water Works & Improvement Company v. Public Service Commission of State of West Virginia, 262 U.S. 679, 692, 43 S.Ct. 675, 679, 67 L.Ed. 1176:

"What annual rate will constitute just compensation depends upon many circumstances and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. * * * The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally."

In Southern Bell Tel. & Tel. Co. v. Louisiana Public Service Commission, 239 La. 175, 225, 118 So.2d 372, 390, this Court stated:

"The ascertainment of a fair return in a given case is a matter incapable of exact mathematical demonstration. It is one of reasonable approximation having its basis in a proper consideration of all relevant facts."

■■ The rate of return is a *judgment* percentage of the rate base which the utility is entitled to earn for interest, dividend payments, and related requirements. The rate should be high enough but not higher than may be necessary to attract capital and to hold it there.[6] The return is the product of the rate of return and rate base.

■■ The question of what constitutes a reasonable return is one of fact rather

---

5. See also Colorado Interstate Gas Company v. Federal Power Commission, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206; Panhandle Eastern Pipe Line Company v. Federal Power Commission, 324 U.S. 635, 65 S.Ct. 821, 89 L.Ed. 1241.

6. See Glaeser, Public Utilities in American Capitalism (1957) p. 386; Barnes, The Economics of Public Utility Regulation (1942) p. 516.

than of law. It requires the application of an enlightened judgment to the multiplicity of variables disclosed by the evidence. As early as 1909, it was recognized that there could be no standard rate of return applicable to all utilities under all circumstances. Willcox v. Consolidated Gas Co., 212 U.S. 19, 48, 29 S.Ct. 192, 198, 53 L.Ed. 382. Therein, the Court stated:

"There is no particular rate of compensation which must in all cases and in all parts of the country be regarded as sufficient for capital invested in business enterprises. Such compensation must depend greatly upon circumstances and locality; among other things, the amount of risk in the business is a most important factor, as well as the locality where the business is conducted, and the rate expected and usually realized there upon investments of a somewhat similar nature with regard to the risk attending them." [7]

This view has found expression in the decisions of this Court. Southern Bell Tel. & Tel. Co. v. Louisiana Public Service Commission, 232 La. 446, 94 So.2d 431, 436; Southern Bell Tel. & Tel. Co. v. Louisiana Public Service Commission, 239 La. 175, 118 So.2d 372.

In the first case this Court said:

"With regard to the application of the 'Cost of Capital' method, the Supreme Court of the United States has recognized that the peculiar situation of each utility, which is largely reflected in its cost of capital, dictates the level of its earnings. There is no constitutional requirement that every regulated company be allowed the same rate of return."

■ For its rate formulation herein, the Commission utilized the cost-of-capital method. The capital structure adopted by it for this methodology was one composed of 60% debt and 40% common equity. On appeal this structure is not assailed by the parties. It approximates the actual capital structure of both United and its parent, United Gas Corporation. We agree with the Commission that it is reasonable and appropriate for testing the earnings requirements of United.

The components of a fair return are the interest payments for indebtedness, the dividend payments to investors in equity, the cost of flotation, and payments into surplus

■ The cost of debt capital has a contractual basis. While it is possible to

---

7. See also Driscoll v. Edison Light & Power Co., 307 U.S. 104, 59 S.Ct. 715, 83 L.Ed. 1134; United Railways & Electric Co. of Baltimore v. West, 280 U.S. 234, 50 S.Ct. 123, 74 L.Ed. 390; Bluefield Water Works & Improvement Company v. Public Service Commission, supra; 43 Am.Jur., Public Utilities and Services No. 156, p. 675; Nichols, Ruling Principles of Utility Regulation: Rate of Return (1955) p. 44.

determine the cost of this to United, we agree with the Commission that in view of the intercorporate relationship the most reliable means of determining the historical cost of debt is to look to United Gas Corporation, the parent company. It is well established that, in making a determination of costs for rate purposes, the reviewing Commission may look through the corporate form of affiliated corporations and probe for economic realities.[8]

 It is a matter of statistical fact, which is not disputed, that the historical cost of debt capital to the parent company is 3.71%. The evidence does not establish that the outstanding debt is to be replaced. It would be imprudent to do so. Hence, the current cost of securing the borrowed capital *de novo* is not controlling in the present case.[9]

We find, as did the Commission, that the proper cost of debt capital for United is 3.71%.

The most serious controversy in this case involves the rate of return on common equity. Unlike debt capital, there is no contractual basis for ascertaining its cost.

 The approach used by the Commission was to utilize the earnings-price ratios. The Commission, of necessity, used the ratio of the parent company which owns all of the stock of United. This technique is designed to reflect investor opinion as to the attractiveness of the common stock as an investment. It has shortcomings in theory and practice which have been referred to by rate authorities [10] and by this Court.[11] Despite its infirmities, however, it serves as a reasonably reliable guide in fixing the cost of equity capital when it is used with the exercise of an informed

---

8. See Southern Bell Tel. & Tel. Co. v. Louisiana Public Service Commission, 239 La. 175, 118 So.2d 372; Alabama Public Service Commission v. Southern Bell Tel. & Tel. Co., 253 Ala. 1, 42 So. 2d 655; Nichols, Op. Cit., pp. 183, 250.

9. United Railways & Electric Co. of Baltimore v. West, 280 U.S. 234, 251, 50 S.Ct. 123, 74 L.Ed. 390; Re Wisconsin Telephone Company (Wis.), 93 PUR (NS) 490, 504; Glaeser, Op. Cit., p. 389; Barnes, Op. Cit., pp. 529–530; Thatcher, Cost-of-Capital Techniques in Determining the Rate of Return for Public Utilities, 30 Land Economics 85, 90; Cf. Southern Bell Tel. & Tel. Co. v. Louisiana Public Service Commission, 239 La. 175, 118 So.2d 372, 382.

10. Clemens, Some Aspects of the Rate of Return, 30 Land Economics 32; Thatcher, Cost-of-Capital Techniques, 30 Land Economics 85; Morehouse, Comments, 31 Land Economics 75; Thatcher, Comments, 31 Land Economics 78; Morrissey, A Reconsideration of Cost of Capital and a Reasonable Rate of Return, 31 Land Economics 229; Badger, Important Concepts as to Fair Return and Cost of Money, 66 Public Utilities Fortnightly 93; Bickley, The Relation Between a Fair Return and the Rate Base, 66 Public Utilities Fortnightly 145.

11. Southern Bell Tel. & Tel. Co. v. Louisiana Public Service Commission, 239 La. 175, 118 So.2d 372, 386.

judgment based not only on the statistical data but also on the other relevant factors which cannot be measured precisely.[12]

The evidence shows that the average earnings-price ratio for United Gas Corporation for the five years 1954–1958 was 6.97%. For the twelve months ending September 30, 1959, the earnings-price ratio was 7.18%.

We now turn to the earnings studies of other companies for application of the comparison standard. These must be used with circumspection. It is difficult, if not impossible, to identify other business undertakings that are truly comparable. When made the comparison results in little more than a consideration of the effects of current economic conditions in investors' attitudes. Finally, there is a dearth of objective data to make comparisons trustworthy.[13] The earnings-price ratios submitted by the expert witnesses, Friend and Knappen, covered the same pipeline companies and the same natural gas distributing utilities. They may be summarized as follows:

| Mr. Friend | 1954 | 1955 | 1956 | 1957 | 1958 | 5 Yr. Avg. | 12 Mos. Ended Sept. 30, 1959 |
|---|---|---|---|---|---|---|---|
| 10 Natural Gas Pipeline Cos. | 6.60 | 7.25 | 7.30 | 7.15 | 6.34 | 6.93 | – |
| 23 Natural Gas Dist. Util. | 7.35 | 7.34 | 7.99 | 7.99 | 7.08 | 7.55 | – |
| Dr. Knappen | | | | | | | |
| 10 Natural Gas Pipeline Cos. | 6.08 | 7.01 | 7.04 | 8.33 | 5.31 | 6.75 | 6.17 |
| 23 Natural Gas Dist. Util. | 6.59 | 7.10 | 7.74 | 8.47 | 6.18 | 7.22 | 6.41 |
| 30 Electric Utilities | 6.56 | 6.52 | 7.00 | 7.14 | 5.55 | 6.55 | 6.55 |

The variances result from differences in method of computation and the effect of the reduction in income of pipeline companies due to making refunds of rate increases under bond. No good purpose could be served in attempting to reconcile them.

The Commission concluded that the earnings-price ratio applicable to United was 7%. No proof of flotation cost appears in the record. The Commission concluded correctly, in our opinion,

12. Nichols, Op. Cit., pp. 318–319; Bonbright, Principles of Public Utility Rates (1961), p. 254; Klein, Accounting Aspects of Utility Regulation, 19 Law and Contemporary Problems, 453–454; Thatcher, Cost-of-Capital · Techniques, 30 Land Economics 85; Thatcher, Comments, 31 Land Economics 78.

13. See Barnes, Op. Cit., p. 527.

that no allowance for it was warranted in the absence of such proof.[14]

Through the exercise of judgment based on the evidence, the Commission adopted 8.18% as the proper cost of equity capital. By combining the components in the differentiated cost of capital determination an overall rate of return of 5.5% resulted and was adopted:

Debt: 60% × 3.71 = 2.23%
Equity: 40% × 8.18 = 3.27%
 ‾‾‾‾‾‾
 5.50%

■ United strenuously urges that the ruling of the Commission herein as to the rate of return conflicts with the decision of this Court in Southern Bell Tel. & Tel. Co. v. Louisiana Public Service Commission, 239 La. 175, 118 So.2d 372. Reference is made to the rate of 6% of the property rate base fixed by the Court in that case. However, the rate problem in the present case is not identical. It is based upon its own variant evidence, with different facts and circumstances. The respective utilities are not similarly situated. The rate in the former case is not controlling here.

■ As a utility United is in a favored position. It enjoys a rather stable demand for its product under constitutional rate protection. We conclude that the rate of

return of 5.5%, which includes 8.18% on common equity, is reasonable and just. It evidences no abuse of power by the Commission. In our opinion, it achieves a proper balancing of investor and consumer interests and enables United to maintain its financial integrity, attract capital, and compensate its investors for the risks assumed.

Allocation of Cost of Service:
The Cost of Purchased Gas

Raised by this appeal is the propriety of the use by the Commission of the system-wide average or "rolled in" method of determining the cost to United of the natural gas purchased by it. This question looms in importance. Purchased gas costs constitute approximately 80% of the total cost of service in the New Orleans zone. Under these circumstances, the severe and unrealistic compression of the gas costs will inevitably render the return unreasonable by process of absorption. The rate of return will be defeated by unrecouped costs.

The two main sources of natural gas for United are South Louisiana and South Texas. The well head price of natural gas in Texas is substantially lower than in Louisiana. While the economic basis for this cost differential is adverted to in the

14. Driscoll v. Edison Light & Power Co., supra; Wabash Valley Electric Co. v. Young, 287 U.S. 488, 53 S.Ct. 234, 77 L.Ed. 447; Galveston Electric Co. v. City of Galveston, 258 U.S. 388, 42 S.Ct. 351, 66 L.Ed. 678.

evidence, it is not deemed a proper subject for analysis here. All of the gas sold by United in the New Orleans zone is produced in Louisiana. For cost determination, however, the Commission adopted a system-wide average [15] cost of gas, thereby reducing the cost of gas purchased for the New Orleans zone in the sum of $517,761.

█ A study of United's system shows that it is in fact two separate systems with smaller interconnecting facilities. One system runs north from southern Louisiana, and the other runs northeast and north from southern Texas. Natural gas cannot be brought into the New Orleans zone from South Texas without terminating service to a major portion of the customers and reversing the gas flow. Neither can the pipeline be moved at will "like a garden hose" to take advantage of lower well head prices. The Commission seeks to support its system-wide average cost determination on the postulation that the gas reserves which enter the pipe line system constitute a common reservoir supplying all of the customers. The absence of a physical flow of gas from all producing areas to the New Orleans zone, it is asserted, is of no moment because the movement takes place by displacement. Under the theory of displace-

ment, it reasons that an increase in the transmission of Texas gas to the interstate customers of United will increase the volume of gas for consumption in the New Orleans zone in an identical amount. These contentions are untenable. They ignore the physical limitations of United's facilities and contravene the scheme of multi-state regulation. The final mathematical exercise leaves a test period cost of $517,761 unaccounted for. Gas costs so calculated are wholly synthetic. Viewed in the light of existing realities, "rolling in" becomes only a method of portaging the rate past the recovery of the actual costs of gas purchased.

█ It is urged that the Federal Power Commission has adopted and approved the system-wide average gas costs in fixing rates for natural gas falling under its regulatory jurisdiction. The decisions of that body are not controlling here.[16]

█ The mandatory separation of intrastate and interstate costs and revenues for state regulatory purposes is well established.

The rule is stated with clarity in 9 American Jurisprudence, Carriers, Sect. 130, p. 520:

15. Although referred to in the Commission's opinion as "system-wide," the record discloses that the North Mississippi zone was excluded in the calculation.
16. The Federal Power Commission has rejected the "rolled in" method for United

based upon the dual structure of its pipeline system. United Gas Pipe Line Company, Docket Nos. G-9547 and G-10592, order issued January 4, 1961. This Court is informed that the case is now pending on appeal.

"A state cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, nor can the carrier impose unreasonably high rates on domestic business in order to meet losses on interstate business: *the reasonableness of the rates to be fixed by the state must be decided with reference exclusively to what is just and reasonable in respect of domestic business.*" (Italics ours.)

In Smith v. Illinois Bell Telephone Company, 282 U.S. 133, 146–148, 51 S.Ct. 65, 68, 75 L.Ed. 255, the court stated:

"At the threshold of the discussion, we are met with the fact that, in these findings, the Commission and the court made no distinction between the intrastate and the interstate property and business of the Company * * *.

"The separation of the intrastate and interstate property, revenues and expenses of the Company is important not simply as a theoretical allocation to two branches of the business. It is essential to the appropriate recognition of the competent governmental authority in each field of regulation. * * * The Commission would have had no authority to impose intrastate rates, if as such they would be confiscatory, on the theory that the interstate revenue

of the company was too small and could be increased to make good the loss. * * *"

In the Minnesota Rate Cases (Simpson v. Shepard), 230 U.S. 352, 435, 33 S.Ct. 729, 755, 57 L.Ed. 1511, the court held:

"Where the business of the carrier is both interstate and intrastate, the question whether a scheme of maximum rates fixed by the state for intrastate transportation affords a fair return, must be determined by considering separately the value of the property employed in the intrastate business and the compensation allowed in that business under the rates prescribed. * * * The reason * * * is that the state cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, and, on the other hand, the carrier cannot justify ureasonably high rates on domestic business because only in that way is it able to meet losses on its interstate business."

This Court very early aligned itself with this rule. In Morgan's Louisiana & T. R. & S. S. Co. v. Railroad Commission of Louisiana, 127 La. 636, 53 So. 890, the Court held as stated in the syllabus written by it:

"Moreover, where the company derives its revenue, partly from interstate and partly from intrastate busi-

ness, a state board is without jurisdiction to predicate a rate upon the revenue derived from the interstate business."

This case has been cited and followed in the following cases: Louisiana Ry. & Navigation Co. v. Railroad Commission of Louisiana, 131 La. 387, 59 So. 820; Vicksburg, S. & P. Ry. Co. v. Railroad Commission of Louisiana, supra; Alexandria & W. Ry. Co. v. Railroad Commission of Louisiana, 143 La. 1067, 79 So. 863; Gulf States Utilities Co. v. Louisiana Public Service Commission, supra; Southern Bell Tel. & Tel. Co. v. Louisiana Public Service Commission, 239 La. 175, 118 So.2d 372.

We recognize that the Commission is vested with discretion to adopt any method of cost allocation which is reasonable or appropriate. Nonetheless, we are forced to conclude that the allocation of gas costs in the instant case based in part upon low cost gas purchased in another state, none of which is used or usable in the rate zone, is arbitrary and destructive of a reasonable end result. It must be rejected.

The alternative cost allocation for purchased gas presented by the record is based upon the average cost of gas transmitted by United into the rate zone. All of this gas is produced and purchased within the state. Approximately one-third of it is used in the zone. The remainder is transmitted to interstate markets. The record discloses that United purchases this gas at a lower rate than all but one of its major competitors. In adopting the alternative allocation based on the evidence herein, we do not hold that the Commission is prohibited from requiring a more precise classification of zonal gas costs when feasible so as to accomplish an isolation of the cost of gas actually used in the rate zone.

As adjusted by us, the total cost of purchased gas for the test period is increased in the sum of $517,761.

Rate Differential between Domestic and Industrial Gas

In its petition to the Commission, United sought to have the historic differential of 5¢ per MCF between domestic and industrial gas reduced to 1.7¢ per MCF. The Commission fixed the differential at 2.75¢ per MCF. The trial court did not disturb this ruling. In this Court the industrial intervenors strenuously contend that the full differential of 5¢ should be reinstated.

It is true that a differential between domestic and industrial rates is warranted. Industrial rates are normally lower because of better load factors and large volume operations. However, each class of business must bear its fair share of the

cost of service. In our opinion, the subsidization of industrial gas costs by the residential and other domestic consumers is unwarranted.

The evidence in reference to the differential is conflicting and in some respects inadequate. After a thorough analysis of it, the Commission stated:

"Because of the lack of accurate peak day information for the General Service and Industrial business of the two utilities, and the apparent discrepancies resulting from the assumption of the Witnesses Nissel and Vandervoort, we must use our own best judgment in fixing the differential in rates between these two classes of business."

It is apparent that the ruling of the Commission is based upon an evaluation of all pertinent factors. The rate differential adopted is reasonably calculated to protect the interests of the domestic consumer and at the same time preserve the competitive position of industry. We discern no caprice or abuse of power in its confection. It will, therefore, be maintained.

In recapitulation:

I. We find that the rate of return of 5.5% as fixed by the Louisiana Public Service Commission is reasonable, and we reinstate it.

II. We reject the system-wide average cost determination of natural gas purchased by the plaintiff, United Gas Pipe Line Company.

III. We affirm the rate differential of 2.75¢ per MCF between domestic and industrial gas fixed by the Louisiana Public Service Commission.

For the reasons assigned, the judgment of the district court is reversed insofar as it set aside Order No. 8061 of the Louisiana Public Service Commission as to the rate of return, and the rate of return of 5.5% fixed by the Commission is hereby reinstated; in all other respects the judgment of the district court is affirmed; and the plaintiff, United Gas Pipe Line Company, is authorized to file and make effective forthwith revised rate schedules for natural gas in the New Orleans zone consistent with this decree.

McCALEB, J., dissents in part.

FOURNET, C. J., dissents.

McCALEB, Justice (dissenting in part).

While I agree with the rulings of the Court as to the other issues in the case, I cannot subscribe to its action in reducing plaintiff's overall rate of return from 6% to 5.5%. The affirmance of the Public Service Commission's allowance of the 5.5% rate of return is plainly contrary to our decision of a year ago in Southern Bell Tel. & Tel. Co. v. Louisiana Pub. Serv. Comm., 239 La. 175, 118 So.2d 372, 389,

where it was resolved that, to allow that company (Southern Bell) a rate of return of less than 6%, when it was shown by the evidence that no other utility was receiving anywhere near as low a return, " * * The disparity is so great that we must of necessity hold that the action of the Commission in its end result is discriminatory and that the rates fixed are not just and reasonable under the circumstances."

It is, of course, well settled that one of the important factors to be considered in fixing just and reasonable rates is that the return to the equity owner " * * * should be commensurate with returns on investments in other enterprises having corresponding risks * * *." See Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 288, 88 L. Ed. 333. In the instant case, it was established that investment in the natural gas transmission business involves a greater risk than investment in either electric or telephone utilities and that for the past 13 years, rate-making bodies throughout the United States have allowed an average of return on equity investment in gas pipeline companies of approximately 12% as com-

pared with 10% for electric utilities. Further, it was shown that, in 34 cases involving utilities engaged in the transmission of natural gas to industry and consumers, the Federal Power Commission has uniformly (except in one isolated instance) allowed an overall rate of return of 6% or more.

In view of these facts, I find it difficult to comprehend how this Court can approve the 5.5% rate of return fixed by the Commission in this case which was reached by utilization of the earnings-price ratio. This technique, as the majority acknowledge, has shortcomings in theory and practice and was criticized by us in our recent Southern Bell decision,[1] our specific holding being " * * * that an earnings-price ratio of 6.75% on a hypothetical 55% of common stock capital as applied to one utility, while others similarly situated are earning 8.5% on equity capital and not less than 6% on property rate base, is discriminatory and for that reason is not just and reasonable."

To say that, by employing the unrealistic earnings-price ratios, 8.18% is the proper cost of equity capital on which to base the rate of return, while others similarly sit-

---

1. We said: "The fallacy of using an earnings-price ratio based on the relationship of current earnings and current market prices is pointed out by the Company's expert witness Langum. As earnings go up or down, the market price of the stock correspondingly goes up or down, so that the earnings-price ratio remains the same. One utility may be earning an excessive rate of return and another a rate of return so low as to be confiscatory, yet the earnings-price ratio would be approximately the same because of the consequent high market price of the stock of the former and the consequent low market price of the stock of the latter.

uated are earning 12% on equity capital and not less than 6% on property rate base, is incompatible in my opinion with fair treatment. Being discriminatory, such a rate base, as stated in the Southern Bell Tel. and Tel. case, " * * * is not just and reasonable."

If the majority does not subscribe to the rationale of our last Southern Bell Tel. and Tel. decision or, for that matter, to Gulf States Utilities Co. v. Louisiana Pub. Serv. Comm., 1952, 222 La. 132, 62 So.2d 250, as is evidently the case, it should say so and those authorities should be specifically overruled. It is in the public interest that this Court make clear its views, and particularly a change in its position, so that the members of the bench and bar are able to know and interpret the jurisprudence.

I think the decision of the trial court is correct and should be affirmed.

FOURNET, Chief Justice (dissenting).

I am in full accord with the views expressed by Mr. Justice McCALEB in the separate opinion in which he dissents in part, and which is to the effect that we should not depart from the settled jurisprudence of this court—and, indeed, from the law universally obtaining—that a public utility company is entitled to a fair and reasonable return on its investment, and to the further effect that in determining what are just and reasonable rates in so far as such utilities are concerned, one of the most important factors to be considered, as pointed out in Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333, is that these rates "should be commensurate with returns on investments in other enterprises having corresponding risks."

While it is my opinion that the Commission in this particular case was possessed of sufficient information and evidence to support its order increasing the rates to insure that the plaintiff would realize a just and a reasonable return on its investment, it is my view that in arriving at these rates the Commission lacked the necessary evidence to support the lesser differential it authorized in the levying of rates for gas sold to domestic consumers and that sold to industrial consumers—historically approximately 5¢ per MCF—and, for this reason, I believe the case should be remanded to the Commission for further consideration and action in this particular respect.

I must, therefore, respectfully dissent from the majority decision.