172 So.2d 670

**MONOCHEM, INC., the Borden Company and United States Rubber Company,**

v.

**LOUISIANA PUBLIC SERVICE COMMISSION and East Ascension Telephone Company, Inc.**

No. 47509.

Feb. 23, 1965.

Rehearing Denied March 29, 1965.

Theo F. Cangelosi, Joseph Kavanaugh, Baton Rouge, for defendants-appellants.

Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, for plaintiffs-appellees.

HAMLIN, Justice.

The Louisiana Public Service Commission (hereinafter referred to as the Commission) and East Ascension Telephone Company, Inc. (hereinafter referred to as East Ascension) appeal to this Court from a judgment of the trial court which ordered and decreed that Order No. 9085 of the Commission be vacated, annulled, and set aside, and that the instant application of East Ascension to the Commission be rejected and denied with prejudice.

The following excerpts from the trial court's *Reasons for Judgment* set forth pertinent facts required for a decision in this case:

"Before 1961 East Ascension Telephone Company served a strictly rural community. In that year great industrial plants were established along the Mississippi River in that area. Extensive use of the telephone was essential to efficient operation of such businesses. It is shown that one of the plaintiffs herein made and received an average of 171 calls per day to and from Baton Rouge. * * * The long distance toll for ordinary use of the telephone between that area and Baton Rouge amounts to about fifty cents. In order to obviate this expense to some extent on calls to and from Baton Rouge plaintiffs arranged to have direct lines installed to con-

nect with the Southern Bell Baton Rouge exchange to enable calls to be made to and from Baton Rouge without the necessity of going through the East Ascension exchange at Gonzales. These direct lines were known as 'foreign exchange service.' It is assumed that these plaintiffs also had telephone lines from their plants to the local exchange of East Ascension in Gonzales.

"The East Ascension Telephone Company entered into a contract with United Engineers and Constructors, Inc., called subscribers,[1] which was the agent of Monochem, Inc., one of the plaintiffs herein and acting for and on behalf of all three plaintiffs, whereby the East Ascension agreed to furnish and install direct lines from said plaintiffs' plants to connect with the lines of Southern Bell leading into Baton Rouge and to furnish and install the necessary equipment in connection therewith. Calls over these direct lines did not go through the East Ascension exchange at Gonzales. The contract provides that the subscriber would pay East Ascension the rates for the use of such lines and equipment in an amount set forth in the East Ascension's tariff approved by the Public Service Commission. Mr. Banker, President and Manager of East Ascension, testified that in the arrangement the subscriber would pay to East Ascension $27 per line per month which he said was sufficient

1. The contract for telephone service entered into between United Engineers and Constructors, Inc. and East Ascension during 1961 recites in part:

"The subscriber has requested the Company to install telephone equipment to furnish PBX telephone service to the Subscriber at Geismar, Louisiana. The Subscriber and the Company recognize that the telephone equipment has to be used for a primary term of service as hereinafter specified for each item of equipment.

"The Subscriber and the Company agree as follows:

"1. The Company will install the equipment described in Paragraph '6' below in the Subscriber's premises located at Geismar, Louisiana.

"2. The Subscriber will pay to the Company the rates and charges for the equipment as set forth in the Company's tariff as approved by the Louisiana Public Service Commission.

"3. The primary term of service starts when the equipment is placed in service.

\*　　\*　　\*　　\*　　\*

"9. The Subscriber agrees that foreign exchange circuits or trunks are to be used for telephone calls originating and/or terminating in the foreign exchange area only and that these circuits shall not be used for toll (long distance) service.

"10. The subscriber hereby agrees to operate the PBX switchboard and to furnish personnel necessary, electric current, and all other things necessary for the operation of the equipment all at its own expense and without right or reimbursement from the Company and agrees to protect and hold Company harmless from any liability public or otherwise arising out of the operation and use of this equipment."

revenue return on the investment to justify the installation and use of the direct lines and equipment.[2] * * * *"

Sometime after the contract, supra, was executed, East Ascension filed with the Commission an amendment to its tariff charges. This amendment provided for a foreign exchange charge of $100.00 per circuit per month for an interconnection between the East Ascension exchange and an exchange of another company, whereby the subscriber could dial any subscriber in

2. "Q. What is the term of that contract?
"A. Well, it is a contract for a certain amount of money.
"Q. I mean by terms, how long was it to last?
"A. Five year contract.
* * * * *
"Q. And wasn't that contract supposed to govern the whole Monochem complex?
"A. This contract was to insure us before we made an investment of a certain amount of revenue, yes.
"Q. And the intent was to cover U. S. Rubber, Monochem and Borden?
"A. That is right. Well, as I stated before we didn't intend it to cover any particular company. We intended for it to cover that area down there.
"Q. That area?
"A. Yes, sir, a certain amount of revnue before we installed cable that we were asked to install, where we didn't have anything at all.
"Q. I see. So you wanted to be sure that the investment was protected?
"A. That is correct.
"Q. And you felt that this contract would protect your investment and pay an adequate return on your investment, is that correct?
"A. That is right.
* * * * *
"Q. Now, did you at that time contemplate that there would be any charge for foreign exchange service such as you are seeking now.
* * * * *
"MR. BANKER: What was the question?
"MR. COATES: I think you answered my question. I believe that I said it was contemplated that there would be foreign exchange service without the charge that you are seeking now, and you said yes?
"A. I don't think any charge for foreign exchange service was discussed in this contract. We only asked in the event that the foreign exchange service was put in that it wouldn't be used for tolls other than to the exchange, the foreign exchange service applied to. There is no charge for foreign exchange service in this contract whatsoever, and there is no money asked for for foreign exchange service. Actually, we don't have a charge for foreign exchange service, and we were not in position to tell a customer what foreign exchange service would cost them. We didn't have any idea what it would cost them. The Bell Company makes all charges for foreign exchange services.
"Q. You are now attempting to make a charge for it, aren't you?
"A. Now I am attempting to make a charge for it.
"Q. But at that time you did not indicate that you were going to make a charge for it, did you?
"A. I didn't think it was necessary."
The evidence reflects that Southern Bell Telephone and Telegraph Company bills the customers direct for the foreign exchange service. East Ascension has an agreement with Southern Bell, whereby that company pays East Ascension a certain amount on each one of the circuits. It is different in each case, depending on mileage; the highest amount paid is $27.00 per line per month.

the exchange of the other company without a toll charge. The tariff was accepted for filing on June 12, 1963, subject to satisfactory arrangements being made with subscribers then enjoying foreign exchange service.[3] Customers were notified that effective August 1, 1963, there would be an inter-exchange charge of $100.00 per circuit for all foreign exchange service; the notification explained that the adjustment, the result of a toll study, *was required so as to compensate East Ascension for revenue losses due to foreign exchange service.*

Protests to the increase were filed by practically all of the foreign exchange customers. The matter was docketed by the Commission for hearing and was tried at a regular session of the Commission on August 12, 1963. On August 14, 1963, the Commission ordered an accounting investigation to determine applicant's present rate of return and to obtain such information as was possible concerning *its loss of revenue in toll calls by affording foreign exchange service.* Order No. 9085 sets forth in part that:

"The accounting staff found that the only way to determine the amount of toll revenue losses is to meter the customer's calls for a period of time, and make estimates as nearly accurate as possible to determine how many of such calls would result in toll revenues if the subscriber had ordinanry service without the foreign exchange feature.

"Tests as above-described were made by the company for two of the larger customers, namely Monochem, Inc. and U. S. Rubber Company. The test for Monochem, Inc. showed that for a period of five days there were 1,318 calls on three circuits. Of these, it was estimated that one-half were outgoing calls and the total of such calls per day were determined to be 132 for the three circuits, or forty-four per circuit. East Ascension received a toll settlement from the Bell Company in accordance with its contract, amounting to 34¢ per toll message. This settlement did not apply to the foreign exchange calls because they were not toll calls. Forty-four calls at 34¢ per call would amount to $14.96 per day per circuit. On a thirty-day basis, the revenue per circuit for a thirty-day period would amount to $448.80 (30 x $14.96). Another similar test of the same customer for a twenty-three day period showed that the revenue per circuit on a monthly basis would amount to $226.60 for East Ascension's share of settlement with the Bell Company, averaged at 35.5¢

3. There were approximately twenty-two foreign exchange lines in use by some fifteen subscribers in the East Ascension area. Monochem, Inc. had three foreign exchange service lines, United States Rubber Company had four lines, and The Borden Company had two lines.

per message, if the customer subscribed to service on a toll call basis instead of foreign exchange.

"A test of calls by U. S. Rubber Company, another foreign exchange customer, on a forty-eight hour basis resulted in average revenue per month of $448.80, or exactly the same amount as one of the Monochem tests.

"The maximum amount that East Ascension received from the above companies per month per circuit was $27.00, depending on mileage."

The Commission stated that it was obvious that East Ascension was entitled to compensation *for its loss in tolls* caused by the subscriber having foreign exchange service; it found that it was extremely difficult to arrive at the proper level for such compensation; it concluded that East Ascension's charge for foreign exchange service, including full time talking circuits into the exchange area of another company, should be fixed at $75.00 per circuit per month. The Commission stated:

"The Commission's staff reported further that if the eleven present subscribers who indicated that they would give up foreign exchange service if the proposal herein is granted actually did so, and the rate on the remaining customers were fixed at $100 per month as requested, applicant's revenue would be augmented by $9,149.00 annually.

(This figure, of course, is not precise since the tolls that would be paid by these eleven customers must be estimated.) The present net operating revenues, before this proposed change, indicate a return of 3.45% on the net plant investment, and after the proposed change (minus the eleven customers) it is estimated that the rate of return would be 3.73%.

"Obviously, therefore, if the foreign exchange charge is fixed at a lower level than the figure requested, the applicant's rate of return would be somewhere between 3.45% and 3.73%. This would be in line with rates of return being earned by other independent telephone companies who obtain the bulk of their capital from the Rural Electrification Administration at 2%.

"The Commission, after considering all testimony adduced in this matter, is of the opinion that a charge of $100 per month per foreign exchange circuit as well as for all full time talking circuits to foreign exchange customers is excessive; and the Commission * * * is of the opinion that this applicant's charge for foreign exchange service * * * should be fixed at $75.00 per circuit per month, * * *".

Plaintiffs filed the present suit in the district court, alleging that Order No. 9085 of the Commission, assessing a $75.00

per month per circuit charge for each foreign exchange service line, was contrary to law and to the evidence in that it was unreasonable, arbitrary, discriminatory, and an abuse and excess of the authority granted to the Commission under Article VI, Section 4, Louisiana Constitution of 1921, LSA; they prayed for the judgment which was herein rendered by the trial court.

The Commission and East Ascension contend that in vacating Order No. 9085 of the Commission, the trial court erred:

"1. In substituting its judgment for that of the Commission when the judgment of the Commission is not arbitrary nor capricious nor contrary to the evidence, and no error of law has been committed.

"2. In concluding and finding that the East Ascension Telephone Company renders no service and has no expense in connection with foreign exchange service.

"3. In concluding and finding that the subscribers to the foreign exchange service are presently paying a fair return to the East Ascension Telephone Company.

4. "The contract requires the subscriber to pay for these lines the rates and charges set forth in the company's tariff.· The testimony does not show whether the company filed anything with the Commission specifying the exact amount the subscriber would pay but if it did not the

"4. In not considering the finding of the Commission Staff as reflected in the order of the Commission, Order No. 9085, dated March 6, 1964, (Exhibit A–9) relative to the loss of ordinary earnings as a result of the foreign exchange service."

In urging the correctness of the Commission's Order No. 9085, East Ascension contends that *because of the loss of toll revenues* it is entitled to an offset; it argues that such loss constitutes an unfair and unjust burden upon the company's other subscribers; it further argues that the company's rate of return is reduced, and that the alleged loss contributes in the long run to the need for general rate increases to all subscribers.

Initially, it is to be noted that in the strict sense this is not a rate case. We are concerned with a special service established by contract between East Ascension and United Engineers and Constructors, Inc.,. agent of plaintiffs. The contract was made by East Ascension and United Engineers and Constructors, Inc., in good faith; it was filed with the Commission, and the Commission approved it.[4]

$27 per month per line as a flat rate to be paid by the plaintiffs was arrived at by somebody and Mr. Banker testified that the amount was a reasonable rate on the cost of the subject facilities." From the trial court's *Reasons for Judgment.*

"Foreign exchange service is not a problem involving a great number of customers. There are, however, cases where it should be furnished. These are the exception and meet peculiar conditions of the customer involved. The rates charged for this type of service should substantially carry the service and should not be low enough so that this type of service is unduly encouraged.

"It is desirable that within its franchise territory each company own the telephone works and system serving that territory. This avoids duplicate ownership of facilities and tends to preserve the integrity of the franchise. * * *

* * * * * *

"In the establishment of charges, a few principles should be recognized. In the first place, as this is an unusual and abnormal kind of service, the subscriber should pay the full cost so that in no case shall other subscribers of either the home or the foreign company be burdened or required to bear any loss due to the inadequacy of the rates. When I speak of the cost of service, I mean to include all elements of cost—operating expenses, taxes, depreciation, and return.

* * * * * *

"To all of these points and others that might be mentioned, it may be urged that the number of instances where foreign exchange service will be desired is small and that the loss, if there is one, will not appreciably affect the home company. As already stated, rates cannot be fixed practicably on such a basis as to make each subscriber pay exactly the cost of serving him, but in the case here being considered where an abnormal and unusual service is desired and where in all probability the larger and stronger companies will be the ones to render the service, it seems desirable that unusual care should be taken to see that the home company particularly receives an amount sufficient to cover all elements of cost and not in any case be called upon to stand a loss." RE Intercompany Foreign Exchange Telephone Service, 64 PUR(NS) 65.

"One of the purposes of foreign exchange service is to preserve the integrity of territory and good will of customers of the independent telephone companies. * * *" RE New York Teleph. Co., 73 PUR(NS) 161.

"Intercompany foreign exchange service is the furnishing of telephone service to a subscriber located in the territory of one telephone company (usually referred to as the normal company) from an exchange of another company (usually called the serving company). * * *

* * * * * *

"Intercompany foreign exchange service, while affecting only a few subscribers in the state of New York, has been a troublesome problem of far more importance than the number of people affected by it.

"The independent telephone companies are anxious to protect their boundary lines. There are a very few of their customers in general located near the boundary line who desire service from a different exchange than the one they would normally be served from. If that exchange is located in the territory of another company, the problem can be solved in one of two ways: first, by changing the boundary line, which all companies are reluctant to do and which would mean large numbers of complaints and hearings and the expenditure of much time and energy by all concerned. The second alternative is the method of intercompany foreign exchange service now in general use under a tariff where a customer desiring the service can obtain it. This service is particularly designed to meet the desires of the customer so that he may have telephone service where his community of interest exists. Frequently it results in a saving to the customer. While he pays certain additional costs, he saves substantially on toll calls which become exchange calls rather than being

specifically billed." RE Cazenovia Teleph. Corp., 8 PUR 3d 38. See, Mountain View Rural Tel. Co. v. Interstate Tel. Co., 55 Idaho 514, 46 P.2d 723.

We conclude from the above authorities that insofar as East Ascension is concerned, "cost" of establishing the instant foreign exchange service is the essential factor for consideration. The amount of East Ascension's investment is not shown in the record, nor does the record reflect that East Ascension renders any service or incurs any expense in connection with plaintiffs' calls to and from Baton Rouge. The contract is for a period of five years; its dissolution is not urged. As stated supra, in 1961 the $27.00 per month per line agreed upon was considered adequate revenue to protect East Ascension's investment. There is no showing made that East Ascension has suffered a direct loss on its investment; there is no showing of any error in East Ascension's calculations insofar as the investment revenue to East Ascension is concerned. East Ascension made no showing before the Commission that the public interest requires the increase for which it prays; it made no showing that the public interest would suffer from a rejection of its demands. The record does not reflect that Southern Bell is dissatisfied with the amounts it assesses the subscribers to the foreign exchange service; the record does dis-

close that East Ascension has endeavored to secure a larger percentage from Southern Bell; this is a matter with which we are not concerned.

We conclude that there is no immediate relationship between the amount assessed for the foreign exchange service and the tolls which might be collected without such service. The trial judge was correct in the following statement made in his *Reasons for Judgment*:

"* * * Those who have had these lines installed are already paying a fair revenue to the company in relation to the cost to the company of the facility. The very purpose of the installation of the lines in the first place was to afford a convenience to and to reduce the expense of the subscriber who used them, and at the same time to produce a revenue with a profit to the company for this particular expansion. There are only twenty-two foreign exchange lines in use by some fifteen subscribers in the East Ascension area. The question may be asked why permit these particular subscribers to call Baton Rouge free when all other subscribers must pay a toll for a like call? The answer to the question is that these particular subscribers are already paying a flat charge for that privilege. It was never intended that the flat charge for the installation of these lines would equal or even

approach the amount of toll charges reckoned by the number of calls made over these lines to and from Baton Rouge.

"* * * The $27 per month per line these plaintiffs pay is a reasonable revenue on East Ascension's investment in this facility, according to Mr. Banker. * * *" Cf. Louisiana Gas Serv. Co. v. Louisiana Public Serv. Com'n, 245 La. 1029, 162 So.2d 555; United Gas Corporation v. City of Monroe, 236 La. 825, 109 So.2d 433.

As stated supra, this case does not directly involve rates. The Commission, however, made a finding that before the proposed change East Ascension's rate of return was 3.45% on the net plant investment, and that after the proposed change (minus eleven customers) it was estimated that the rate of return would be 3.73%. We find that the Commission then conjectured by allowing East Ascension an increased charge of $75.00 per circuit per month for foreign exchange service, such amount to compensate for loss of tolls. Under the facts of this case as shown by the record, this Court cannot accept such a finding.

▬▬▬▬ It is settled jurisprudence of this Court that orders of the Public Service Commission should be accorded great weight, will not be overturned by the court in the absence of a clear showing of abuse

of power, and that where the order is not arbitrarily or grossly contrary to the evidence and no error of law has been committed, the court will not substitute its judgment for that of the Commission. Rubion Transfer & Storage Co., Inc. v. Louisiana Pub. Serv. Com'n, 240 La. 440, 123 So.2d 880; Saia Motor Freight Line v. Louisiana Pub. Serv. Com'n, 243 La. 787, 147 So.2d 390; Louisiana Tank Truck Car v. Louisiana Pub. Serv. Com'n, 244 La. 909, 155 So.2d 15.

After a review of the record herein, we find that the district court was correct in vacating, annulling, and setting aside Order No. 9085 of the Commission. We find that under the facts of this case the Commission's conclusions were arbitrary and were not supported by the evidence; it acted in an unreasonable manner, and its order may be reversed. Cf. Southern Bell Tel. & T. Co. v. Louisiana Pub. Serv. Com'n, 239 La. 175, 118 So.2d 372.

For the reasons assigned, the judgment of the Nineteenth Judicial District Court in and for the Parish of East Baton Rouge is affirmed. Defendant East Ascension Telephone Company, Inc., is cast for all costs.

SANDERS, Justice (concurring).

The East Ascension Telephone Company's petition to the Commission sought an adjustment of a specific rate, that of foreign exchange service. Hence, it was directed to the rate schedule, or structure, rather than the over-all rate of return. Schedule formulation is normally the second step in the rate-making process. As stated in Federal Power Commission v. Natural Gas Pipeline Company, 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037, "The establishment of a rate for a regulated industry often involves two steps of different character, one of which may appropriately precede the other. The first is the adjustment of the general revenue level to the demands of a fair return. The second is the adjustment of a rate schedule conforming to that level so as to eliminate discriminations and unfairness from its details." 315 U.S. 575, 584, 62 S.Ct. 736, 742, 86 L.Ed. 1037, 1048–1049.

In fixing a differential rate in a schedule, one factor to be considered is the cost of the specific service. This will, of course, include operating expenses, maintenance, and depreciation. The cost of the specific service, however, is not the only pertinent factor. Among other factors to be considered are the fair apportionment of the total revenue requirements among the various classes of consumers and the maintenance of optimum use of the various classes of service. See United Gas Pipe Line Co. v. Louisiana Public Service Com'n, 241 La. 687, 130 So.2d 652 (Industrial gas rates); Re Southern New England Telephone Company, 73 P.U.R.

(n. s.) 185; Re Intercompany Foreign Exchange Telephone Service, 64 P.U.R. (n. s.) 65; and Bonbright, Principles of Public Utility Rates, pp. 287–305 (1961).

Since, as found in the majority opinion, the Commission based its order solely on the loss of long distance tolls caused by the foreign exchange subscriber, I concur in the decree.