221 So.2d 504

**MONOCHEM, INC. and The Borden Company**

**v.**

**LOUISIANA PUBLIC SERVICE COMMIS- SION, East Ascension Telephone Company, Inc., and Southern Bell Telephone & Telegraph Company.[1]**

**EAST ASCENSION TELEPHONE COMPANY, Inc.**

**v.**

**LOUISIANA PUBLIC SERVICE COMMISSION et al.[2]**

Nos. 49353, 49354.

March 31, 1969.

Rehearing Denied May 5, 1969.

1. Southern Bell T. & T. Co. was made a party defendant; plaintiffs voluntarily dismissed their suit as to this defendant.
2. In reasons for judgment, the district court stated: "At the Commission's hearing on the application here involved, United States Rubber Company was a petitioner, however this company dropped out of the proceedings somewhere along the line before the matter reached the court."

Theo F. Cangelosi, John Schwab, Robert L. Cangelosi, Joseph H. Kavanaugh, Baton Rouge, for appellants.

Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, for appellees.

HAMLIN, Justice:

East Ascension Telephone Company, Inc. (hereinafter referred to as EATEL) and the Louisiana Public Service Commission (hereinafter referred to as the Commission) jointly appeal to this Court from a judgment of the trial court which ordered EATEL to furnish Monochem, Inc. two additional foreign exchange telephones and The Borden Company three additional foreign exchange telephones, each from the Baton Rouge Exchange of Southern Bell Telephone & Telegraph Company to the two companies' plants at Geismar, Louisiana, and decreed that the interconnection charge of $75.00 per month in favor of EATEL on Monochem's and Borden's foreign exchange telephones located in Geismar, Louisiana, is invalid. The judgment further provided that any charge for foreign exchange service shall be that agreed upon by the parties or that fixed by the Commission in proper proceedings not inconsistent with this Court's decision in Monochem, Inc. v. Louisiana Public Service Commission, 247 La. 532, 172 So.2d 670 (1965).

In the Monochem case, supra, to which the present case is a sequel, this Court considered Order No. 9085 of the Commission which concluded that EATEL's charge for foreign exchange service, including full time talking circuits into the exchange area of another company, should be fixed at $75.00 per circuit per month. In affirming the judgment of the district court which vacated the Commission's order, we stated in part:

"We conclude * * * that insofar as East Ascension is concerned, 'cost' of establishing the instant foreign exchange service is the essential factor for consideration. The amount of East Ascension's investment is not shown in the

record, nor does the record reflect that East Ascension renders any service or incurs any expense in connection with plaintiffs' calls to and from Baton Rouge. [Plaintiffs were Monochem, Inc., The Borden Company, and United States Rubber Company.] The contract is for a period of five years; [commencing in 1961] its dissolution is not urged."

In the foregoing case we found that there was no immediate relationship between the amount assessed for the foreign exchange service and the tolls which might be collected without such service. (The Commission stated that it was obvious that EATEL was entitled to compensation for its loss in tolls.) We concluded that under the facts of *that* case the Commission's conclusions were arbitrary and not supported by the evidence. We also concluded that the Commission acted in an unreasonable manner and that its order could be reversed.

In reasons for judgment in the instant case, the district court stated:

"Shortly thereafter [Rehearing denied in the Monochem case, supra, March 29, 1965.], that is, on April 21, 1965, the Commission had under consideration a motion for a restraining order against East Ascension relative to its refusal to furnish foreign exchange service to some applicants unless they agreed to pay the additional $75 per month. The Commission held the matter open until such time as it could determine the rights of East Ascension in this connection. In the meantime it refrained from charging this additional $75 per month to the petitioners in the cited case. In an order dated July 23, 1965 the Commission ordered East Ascension to afford foreign exchange service to the extent of its ability upon the agreement of the customer to pay the additional $75 per month. The record here does not show whether the plaintiffs in the cited case were still relieved of this $75 per month charge. It is to be noted that the contract involved in the cited case was for a period of five years, and apparently expired in 1966. In any event, matters were undisturbed until the present plaintiffs filed an application with the Commission in February 1967 seeking an order directed to Southern Bell and East Ascension to furnish extended area service between their customers with the cost of such service to be allocated equitably among all the customers of both companies; * * *"

Plaintiffs further prayed that:

"(2) This Commission order East Ascension Telephone Company and Southern Bell Telephone & Telegraph Company to furnish three additional foreign exchange service lines from Southern Bell's Baton Rouge exchange to the Borden Company at Geismar, two additional foreign exchange service lines from

Southern Bell's Baton Rouge exchange to Monochem, Inc. at Geismar, and one additional foreign exchange service line from Southern Bell's Baton Rouge exchange to United States Rubber Company;

"(3) That the rate for the foreign exchange service lines furnished to petitioners and other similarly situated be fixed at Southern Bell's one-party rate for customers of the Baton Rouge exchange plus a reasonable mileage charge for the extra line furnished for this service, with whatever allocation between Southern Bell and East Ascension this Commission deems to be equitable; and

"(4) Should this Commission determine not to require extended area service and not to order additional foreign exchange service lines at the rates herein prayed for, then the property of petitioners and others similarly situated should be allocated to the Baton Rouge exchange of Southern Bell."

On October 30, 1967, after hearing had commenced on July 12, 1967, the Commission issued Order No. 9948, Docket No. 9997, which recited:

"This matter was considered at a regular Business and Executive meeting of the Commission held in Baton Rouge on October 20, 1967, and the Commission finds that the rates and charges presently in force are justified, and that the relief prayed for be and it is accordingly ORDERED *denied.*"

On November 9, 1967, EATEL applied to the Commission for a rehearing; it alleged that the complainants were properly denied their petition to have put into effect the alterations in rates, service practices, and territories, but that the order *failed to make clear* that the rates and charges presently in force for the provision by EATEL of foreign exchange service to all of its customers are to apply as well to the foreign exchange lines already in service to complainants.[3] The Commission's Minutes of December 13, 1967 recite that the request for rehearing would be held in abeyance pending filing of briefs.

Monochem, Inc. and The Borden Company filed the instant proceeding in the Nineteenth Judicial District Court on December 14, 1967. They prayed that the Commission's Order No. 9948 be declared null, void, and of no effect, and that EATEL and Southern Bell Telephone & Telegraph Company be ordered to provide

---

3. EATEL moved the Commission "to rehear, reconsider, reopen and present reargument of the instant proceedings, and that, following such rehearing, reconsideration, reopening, and reargument of this matter, the Commission Order No. 9948 *will make explicit* the application of it to foreign exchange lines of complainants existing as of the date of institution of these proceedings." (Emphasis ours.)

to them additional foreign exchange service lines, at *reasonable* rates, as prayed for in their application before the Commission.[4]

EATEL filed a petition in the district court on January 17, 1968, in which it prayed for judgment "providing that Louisiana Public Service Commission Order Number 9948 makes effective the charge presently made for foreign exchange telephone service by East Ascension Telephone Company alike to all foreign exchange telephone service rendered by it alike, including all foreign exchange telephone service rendered by it to Monochem, Inc., The Borden Company, and United States Rubber Company."

The district court rendered the judgment, supra, and the appeal is now before us for consideration. EATEL and the Commission contend that the district court committed the following errors:

"1.

"In holding that East Ascension Telephone Company offered no evidence as to the cost of providing foreign exchange telephone service.

"2.

"In substituting its judgment for that of the Public Service Commission when the judgment of the Commission did not constitute an abuse of power and

was not arbitrary or capricious or grossly contrary to the evidence, and no error of law had been committed.

"3.

"In leaving East Ascension Telephone Company with no tariff charge for the provision of foreign exchange service to appellees."

EATEL and the Commission urge that the present record not only demonstrates an appropriate consideration of the cost factors to be taken into account in providing foreign exchange service, but moreover shows due regard for the other aspects of pricing a particular utility service. They submit that this Court will discern no whim or caprice, no error of law or abuse of discretion, which could justify substitution of judicial judgment for that of the Commission.

Monochem and Borden contend that this Court should affirm the lower court's holding and should enter an order requiring foreign exchange service to be rendered by EATEL to them, specifically ordering three additional foreign exchange telephones to be furnished to The Borden Company and two additional foreign exchange telephones to Monochem, Inc. In addition, they urge that a general order should be issued requiring additional foreign exchange telephones to be installed by EATEL when requested by Monochem

4. See, LSA–R.S. 45:1192; Art. VI, Sec. 5, La.Const. of 1921.

and Borden or others similarly situated. They still further urge that this Court should establish a rate for foreign exchange service based on the one-party rate per customers of the Baton Rouge Exchange of Southern Bell Telephone & Telegraph Company, Inc. plus the mileage charge now in effect for extra line used for a foreign exchange service, to be applied to them and others similarly situated.

Ernest W. Watson, Communications Consultant carrying on a general consulting practice, appearing in behalf of EATEL, described as follows the service which EATEL considered to be foreign exchange service and which was involved in the proceedings before the Commission: "This is the service which first will enable a subscriber to this service when located in the Gonzales exchange area to communicate with all of the telephone stations in the Baton Rouge area and secondly enable all of the customers to telephone service in the Baton Rouge Area to communicate with the subscriber in the Gonzales Exchange Area under a fixed monthly charge billed to and paid by the Gonzales subscriber." With respect to the propriety of a monthly charge of $154.50— $13.50 Baton Rouge Southern Bell rate, $66.00 interexchange circuit mileage, plus the $75.00 under consideration—Watson testified that he considered four factors, namely:—(1) the pricing of the services

for which the foreign exchange service is an alternate; (2) the value of the service to the customer; (3) a consideration of the costs of providing the service; and (4) the establishment of a price which would accomplish the purpose intended in fairness to the customers of such service and to all of the other customers of the area. He testified at length with respect to these four factors and then summarized his testimony as follows:

"In my study of the problem of East Ascension Telephone Company of determining an appropriate total price for the Baton Rouge foreign exchange service in the Gonzales exchange, I have reviewed the subject by the various approaches which are available for the determination of a price for a specific segment of the total services offered by a telephone company. I have used the factors of value-of-service, relative usage, correlation of pricing for similar services, avoidance of unreasonable preferential treatment, the fairness to the customers of the service and the other customers of the area, pricing methods of the Southern Bell Telephone and of cost. The consideration of all of these factors leads me to the conclusion that for the reasons as covered throughout my testimony the appropriate price for Baton Rouge foreign exchange individual line service in the Gonzales base rate

area should not be lower than $154.50 per month."

When asked on cross-examination what additional costs, administrative costs, overhead costs, and direct costs would be incurred by EATEL in the operation of a direct line, Watson responded, "Negligible." But, later, when asked, "Is this a direct line like as if you were in the Baton Rouge area?" He responded, "That is right, that is right. That's why I say this is a very small part of the costs that are involved in this particular service because the phrasing of this service could involve substantial additions in the Baton Rouge exchange system."

In conclusion, Watson testified:

"Q. I think this will probably be the last question. Is it necessary for the installation of a foreign exchange line to add a subscriber loop in Southern Bell's Baton Rouge office?

"A. No, actually, what this foreign exchange line does is make all of subscriber loops of Southern Bell in Baton Rouge usable to the foreign exchange customer; for the 80,000 customers in Baton Rouge there any and all of their subscribers could be used in connection with the service, that's right.

"Q. Would the addition of a foreign exchange line utilize a Baton Rouge exchange loop?

"A. It utilizes the Baton Rouge telephone number. It utilizes a number on the so-called line finder and on a connector block. So it does involve the central office equipment in the Baton Rouge office in two-ways at least.

"Q. Would this reflect in any manner in the inter-company settlement between Bell and the independent in terms of varying it one way or the other because of this utilization of the Bell plant?

"A. *There are so many elements to be brought into consideration when discussing a right, inter-company foreign exchange agreement because as I stated previously, I can't look at this alone without also looking at the companion service, namely, the message toll. There are so many elements to be considered.*

"Q. Is that what you have done in your presentation?

"A. In my presentation I have dealt with pricing and pricing alone. I haven't thought as to the physical means followed for services furnished or who furnishes what. All these things to me are—really have

no place in finding the right kind of a price for really what we are talking of here is a discount to message toll service, and pricing." (Emphasis ours.)

Charles H. Garity, Assistant Vice-President in Operations Staff of Southern Bell Telephone & Telegraph Company, Atlanta, Georgia, testified with respect to the policies of Southern Bell in furnishing foreign exchange. Southern Bell and EATEL are not exact comparables; Garity's testimony, however, was thoroughly explanatory and was enlightening to a solution of the issue involved.[5]

A reading of the entire testimony of Ernest W. Watson, quoted and narrated in part, supra, compels us to conclude that the following statement of the district court is not entirely correct:

"As the court understands the record in this case, the chief basis for the Commission's finding that $75 per month is a reasonable charge is the evidence dealing with the loss of toll charges resulting from the granting of the foreign exchange lines. East Ascension offered no evidence as to the cost of providing this service. The only effort made in this connection was by the cross-examin-

---

5. Pertinent testimony of Garity is as follows:

"Q. Do you in determining the appropriate rate for foreign exchange service consider that reduction in toll revenue pertinent?

"MR. GARITY: Do I consider reduction of toll revenue?

"Q. In determining an appropriate rate for foreign exchange, do you give consideration to loss in toll revenue?

"A. Mr. Phillips it has been many years since the rates for foreign exchange service were set, so I can't answer you what do I do.

"Q. What is done?

"A. I would say that the revenue is just one of the factors that, as I tried to explain in my testimony, there are expense savings, that also must be taken into account, and also our prices are part and parcel of the whole gamut of private line services, for instances, that we offer.

"Q. Just, if you can, here your testimony is complete about the service that you would provide and the service, the facilities that East Ascension would pro-

vide in a foreign exchange, an additional foreign exchange line for one of these customers, but is it not true that you provide the—all of the—well what do you provide if you can tell me as opposed to East Ascension?

"A. In this particular instance?

"Q. To provide the service to one of these companies, including everything done in your office?

"A. We provide the telephone number and the switching gear through which each of these calls must pass. *We provide the circuit from Baton Rouge central office up to the Gonzales central office at which point we connect with the facilities of the East Ascension Company. From there on they provide the local loop from the Gonzales central office back to the customer's location and the termination in a PBX at that location.*

"* * * * *

"Q. *Who does the billing on foreign exchange charges?*

"A. *In this particular situation East Ascension Telephone Company.*" (Emphasis ours.)

ation of defendants' expert witness by counsel for these plaintiffs. He, of course, was unable to give any testimony as to these costs."

We find that Watson *did give some testimony with respect to costs.* He also thoroughly explained that when toll service is discontinued and foreign exchange is installed, a company such as EATEL will suffer a corresponding loss of revenue. He testified that such loss would have some effect on the price of a foreign exchange line.

According to the settled jurisprudence of this Court, the decisions of the Commission are to be accorded great weight and are not to be disturbed unless found to be clearly erroneous or unsupported by the evidence. Arkansas & La. Mo. Ry. Co. v. Louisiana Pub. Serv. Com'n., 251 La. 963, 207 So.2d 760. Courts should act slowly in substituting their own views for those of the expert body charged with the legislative function of rate making, a technical field which embraces far-reaching economic policies. The decision of the Commission should not be disturbed in the absence of a clear showing of abuse of power. United Gas Pipe Line Co. v. Louisiana Public Serv. Com'n., 241 La. 687, 130 So.2d 652. See, Monochem, Inc. v. Louisiana Public Service Com'n., 247

La. 532, 172 So.2d 670; Saia Motor Freight Line v. Louisiana Pub. Serv. Com'n., 248 La. 1, 176 So.2d 408.

It is conceded that the instant matter is an unusual and complex one, and we have been presented with no case similar in point. It is a matter of common knowledge that telephone service is undergoing a transition and that customer pricing is subject to revision. As shown by the record, there is a substantial demand for the type of service involved. Ernest W. Watson's testimony reflects that foreign exchange lines will bring change to EATEL's method of service. It will have an effect on the circuits; indirectly, and perhaps directly, use by subscribers, other than plaintiffs, is bound to be affected. Watson's testimony definitely shows that pricing is a factor in this matter.

Having considered the facts and circumstances of this unusual and complex matter, we do not find that there are presently exceptional circumstances authorizing a finding that the Commission abused its discretion, or that its actions are arbitrary, discriminatory, capricious, and confiscatory. Cf. Southern Bell T. & T. Co. v. Louisiana Pub. Serv. Com'n., 232 La. 446, 94 So.2d 431, 438. The record is replete to the effect that the Commission has given continuous study to the question

of telephone service—rates, pricing, and installations. We do not feel that the Commission's decision should be immediately disturbed; there is an absence of any clear showing of abuse of power. The orders are presumed proper and legal. The burden rests on the person attacking. Southern Bell T. & T. Co. v. Louisiana Pub. Serv. Com'n., 232 La. 446, 94 So.2d 431; Southern Bell T. & T. Co. v. Louisiana Pub. Serv. Com'n., 183 La. 741, 164 So. 786; Texas & P. Ry. Co. v. Railroad Commission, 127 La. 387, 53 So. 660.

Differently from the judge of the district court, we do not find that Monochem and Borden bore their burden.

 We do not find that the Commission's Order No. 9948 is sufficiently explicit as to pricing and charging for foreign exchange service by EATEL. The matter should be remanded for clarification and interpretation of the order.[6]

---

6. The author of this opinion observes that two important telephone rate cases decided by this Court in recent years are Southern Bell T. & T. Co. v. Louisiana Pub. Serv. Com'n., 232 La. 446, 94 So.2d 431 (1957), and Southern Bell T. & T. Co. v. Louisiana Pub. Serv. Comm., 239 La. 175, 118 So.2d 372 (1960). In the first case, we affirmed the Commission's order because, simply stated, the company predicted that the Commission's formula would not produce a fair rate of return on its Louisiana intrastate operations. The Commission, on the contrary, predicted that its new method would result in a fair level of earnings. A test period of *one year* was established; our second decision, rendered in 1960, was based upon *facts* established by and during the test period.

No test period was established in the instant matter. Had one been established, perhaps this matter would have been less "complex."

If further litigation is contemplated, a test period can be applied for by any of the interested parties. During such period, *Monochem and Borden will not suffer* such injury as to amount to confiscation, nor will EATEL be unduly enriched.

If further litigation is contemplated, the following principles should be considered: Ascertainment of a fair return in a given case is incapable of exact mathematical demonstration. It is one of reasonable approximation, having its basis in the proper consideration of all relevant facts. Southern Bell T. & T. Co. v. Louisiana Pub. Serv. Com'n., 239 La. 175, 225, 118 So.2d 372, 390. The rate-making process, i. e., the fixing of just and reasonable rates involves a balancing of the investor and the consumer interests. Under the statutory standard of "just and reasonable," it is the result reached, not the method employed, which is controlling. Southern Bell T. & T. Co. v. Louisiana Pub. Serv. Com'n., 232 La. 446, 94 So.2d 431, and authorities cited.

In the event of establishment of a test period, these are some of the questions which must be considered and answered in order to obtain a just and reasonable end result: (1) How will the subscriber, investor and company be affected? (2) As to the subscriber: Will the lines of EATEL be clogged to such an extent that the other subscribers will suffer? (3) As to the investor: Will the company be unable to realize a fair and just return on its investment to such an extent that its stockholders will suffer? Debt structure and percentages of debt and equity capital may have to be considered in determining the rate. (4) As to the company: Will there be an additional burden on EATEL? Will it be compelled to expand its plant? Will this burden have the effect on its cost of operation, personnel, facilities, operation of its plant,

For the reasons assigned, the judgment of the Nineteenth Judicial District Court is reversed and set aside. Order No. 9948 of the Louisiana Public Service Commission is decreed to be in full force and effect. The matter is remanded to the Commission for the purpose of explanation, clarification, and interpretation of Order No. 9948, insofar as said Order affects East Ascension Telephone Company, Inc.'s pricing of and charging for foreign exchange service to its subscribers. Costs to be borne by Monochem, Inc. and The Borden Company.

BARHAM, J., concurs.

SUMMERS, Justice (dissenting in part and concurring in part).

I do not agree that the case should be remanded. Otherwise I concur in the result.

trunk lines, electric lines, rolling stock, repairmen, and other factors in the operation of its business whereby the investor will be affected?

In Southern Bell T. & T. Co. v. Louisiana Pub. Serv. Com'n., 232 La. 446, 94 So.2d 431, the following statement was quoted from the case of Vicksburg, S. & P. Ry. Co. v. Railroad Commission of Louisiana, 153 La. 983, 96 So. 832, 833: "But inasmuch as such functions are by their nature legislative in character, and courts, owing to their methods of procedure, often cannot intelligently pass upon the advisability or propriety of regulations affecting the future as well as the present, it follows that courts should act slowly in substituting their own views and discretion for those of a body peculiarly constituted to act intelligently in such cases, and primarily charged with doing so, and that they ought never to interfere with such bodies except when their action is clearly arbitrary, or unreasonable to an extent which in effect makes them so. * * * *" After the foregoing factors and others pertinent are considered, the Commission will be able to act clearly and intelligently.