223 So.2d 132 (1969)
254 La. 160
KANSAS CITY SOUTHERN RAILWAY COMPANY et al.
v.
LOUISIANA PUBLIC SERVICE COMMISSION et al.
No. 49532.
Supreme Court of Louisiana.
May 5, 1969.
*133 Arthur R. Carmody, Jr., Wilkinson, Woods, Carmody, Meadows & Hall, Shreveport, for plaintiffs-appellants.
Joseph H. Kavanaugh, Marshall B. Brinkley, Philip K. Jones, Baton Rouge, for defendants-appellees.
McCALEB, Justice.
The State, Through the Department of Highways, filed a petition before the Louisiana Public Service Commission seeking an order requiring the Kansas City Southern Railway Company and the Louisiana & Arkansas Railway Company (hereinafter referred to as the railroad) to allow the City of Pineville and the Highway Department to cross at grade certain main line and switch, spur and other adjacent tracks owned by the railroad, conformably with the provisions of R.S. 45:841. This project was designated as State Project No. 840-30-01 as part of State Route Louisiana 3108, and the proposed grade crossing was designed to be a continuation of Church Street in Pineville, thus constituting a direct route from the Pineville-Alexandria Expressway area served by Crepe Myrtle Street.
The railroad opposed the petition, filing an exception of no cause or right of action in which it was alleged that the proposed extension of the highway across the railroad tracks directly over and through the railroad's industrial yard is illegal; that, in this particular location, there are seven railroad tracks which would be traversed at grade, and such a crossing would present a hazard to exceptors and their employees and to the industry served by exceptors as well as the public in general; that the tract and rights of way in this area are owned in fee simple by the railroad and, as a matter of law, such rights of way may not be appropriated by the Department of Highways through a show cause order before the Commission but must be acquired through expropriation proceedings before a court of law; and that there is no law authorizing the allowance of a grade crossing in the manner sought by the Department herein.
It does not appear that the Public Service Commission specifically passed on the railroad's exception but, presumably, it was found untenable. For, following two hearings on the merits of the case at which considerable evidence was taken, it issued Order No. 9710 directing the railroad to permit *134 construction of the crossing as specified in the Department's request, ordering and directing that the railroad enter negotiations with the Department, the City of Pineville, the Rapides Parish Police Jury and/or any other public body concerned and, thereafter, join in the agreements and procedures necessary to effectuate the construction and maintenance of the proposed crossing.
The railroad appealed to the district court, where the Commission's order was affirmed on the authority of Illinois Central R. Co. v. Louisiana Pub. Serv. Comm., 224 La. 279, 69 So.2d 43, although the district judge expressed apprehension that the nature of the proposed crossing and construction in this case may well present circumstances somewhat different from those appearing in the Illinois Central Railroad case.
It is appropriate, at the outset, to set forth the physical facts showing the locality of the proposed crossing and the nature of the extension of Church Street the Highway Department seeks in order to provide the inhabitants of the Crepe Myrtle Street area with an access road to the Pineville-Alexandria Expressway. When the case was heard below, the trial judge ordered certain additional testimony to be adduced and requested counsel to file a plat providing a more accurate description of the railroad property over which the road was to be constructed. Further evidence was then taken and a plat filed which was identified as KCS and L & A No. 1-A. The judge correctly portrays the project in his written reasons for judgment as follows:
"* * * From the east boundary where the proposed street enters plaintiff railroad's property to the west boundary, plaintiff railroad's property where the proposed street leaves or exists plaintiff's property is approximately 361 feet. This distance is a little longer on the north side than it is on the south side due to the angle of the east boundary of plaintiff's property. The proposed highway is 80 feet wide, flaring out at each end on the east and west to approximately 125 feet.
"This proposed street which in fact is a continuation of Crepe Myrtle Street crosses two main lines of plaintiff and some four or five switches or spur tracks, or as they are sometimes called side tracks. One of the main lines goes from Shreveport to New Orleans and the other main line branch goes from Alexandria to Hope, Arkansas. The switches, side tracks and spur tracks are between the two main lines. The right of way of the two main lines is 100 feet, or 50 feet on each side from the center of the tracks. The right of way of main line from Shreveport to New Orleans being 50 feet from the center of the track to the west boundary of plaintiff's property and the right of way of the main line of the branch from Alexandria to Hope, Arkansas being 50 feet from the center of the track to the east boundary of plaintiff's property. The two combined rights of way of 100 feet each of the two main line tracks constituting 200 feet. As above stated, it is 361 feet from where the proposed road enters plaintiff's property on the east to where it exits on the west side of plaintiff's property, leaving a distance of 161 feet in between the two main lines right of ways. However, the spur tracks, side tracks and switches are in between the two main lines and their respective rights of way, some of these spur tracks being only a few feet from the main lines and from each other. * * *"
The railroad's primary legal position is that its main and subsidiary lines and spur tracks, which the Department seeks to cross at grade, are private property, which cannot be taken for public purposes except by expropriation in judicial proceedings. This contention is divided into four specifications of error, but we do not find it essential to separately discuss each specification as all stem from the same basic claim that its private property is being taken for public *135 purposes without payment of compensation.
This postulation, we think, is fully answered by our decision in the Illinois Central R. Co. v. Louisiana Pub. Serv. Comm. case, where it was held that R.S. 45:841, which specifically authorizes the Public Service Commission to require the operators of railways "* * * crossing any public road already constructed or which may be constructed, to construct and maintain a suitable and convenient crossing over such public road, the crossing to extend to the limits of the right of way, or fifty feet from the center of such railway, * * * in accordance with the standard specifications furnished by the Department of Highways in respect to such crossings", is a valid exercise of the State's police power. In thus concluding, the Court declared:
"We do not think that the position of the railroad is well founded. The fact that the company holds an unencumbered paper title to the land which it uses as its right of way does not warrant the conclusion that it has a perfect ownership as defined by Article 490 of the LSA-Civil Code. On the contrary, by the very nature of the business in which it engages, the right of way is impressed with a public interest and is declared to be a public highway by Section 3 of Article 13 of our Constitution. Therefore, LSA-R.S. 45:841 is not violative of Section 2 of Article 1 of the Constitution as the prohibition contained therein forbids only the taking of private property for public purposes without adequate compensation. Implicit in the charter and franchise of the railroad company is the implied condition that it is granted subject to the right of the State, in the exercise of its police power, to establish and authorize new works necessary and subservient to the convenience and safety of its citizens which might cause damage to the property of the railroad. To this end, the State has the power to require the railroad the uncompensated duty of constructing and maintaining all such crossings over its right of way as are reasonable and necessary for the public."
Counsel for the railroad in the instant case, evidently realizing the controlling effect of our ruling in Illinois Central R. Co. v. Louisiana Pub. Serv. Com'n., do not directly attack the constitutionality of R.S. 45:841 nor do they assail the correctness of that decision. However, they proclaim that the Illinois Central decision does not apply and should not be extended to the burdening of railway property rights of an industrial nature beyond the rights of way used for the mere passage of trains. As we comprehend this argument, it would restrict the power of the Public Service Commission to order a public crossing, as stated in counsel's brief, to the "* * * conventional or usual railroad right of way * * *, that is, to the rights of way required only for the passage of trains from one point to another." From this premise it is asserted that the demand is unauthorized since the crossing sought by the Highway Department encompasses not only its two main tracks but, actually, the railroad's industrial yard because, between the two main line tracks, there are several spur tracks, side tracks and switch tracks, some of which are located only a few feet from the main lines and from each other.
The contention is founded on a faulty premise. R.S. 45:841 makes no distinction between main lines, subsidiary lines, spur tracks, switch tracks and the like. On the contrary, it makes it incumbent upon the operator of any railway or railroad, "* * * tram road, log road, transportation, irrigation or drainage canal, or syphon * * * to construct and maintain a suitable and convenient crossing over such public road * * *." Each track adjacent to the main lines has its own right of way and, accordingly, the five inner rights of way come within the purview of R.S. 45:841. Hence, the argument is untenable.
On the merits of the case, however, a careful review of the record has convinced *136 us that the Public Service Commission abused its discretion in ordering the railroad to permit the Department to construct the crossing over its property under the facts and circumstances presented.
In resolving that the Department is entitled to the railroad crossing contemplated in this proceeding, the Public Service Commission found on the merits that, since the proposed crossing would in effect be a continuation of Church Street and thereby constitute a direct route from the Pineville-Alexandria Expressway to the area served by Crepe Myrtle Street, it was the best route for the access road even though it will cross numerous railroad tracks and, consequently, will present additional traffic hazards to the public. This route was selected over alternate crossings proposed at Baptist Street, where approximately the same number of railroad tracks would have to be traversed, and also an alternate crossing at Jones Street near the end of the new Red River Bridge, where only one main line track of the railroad would have to be crossed. It was declared by the Commission that the Jones Street crossing was considered "* * * unfavorable because it would necessitate the removal and relocation of the connecting ramp between the north bound traffic lane of the Expressway and the east frontage road."
Further, in its reasons approving the project contemplated by the Department, the Commission found "* * * that such crossing would constitute no greater hazard, if proper precautions be taken, than other proposed crossings * * *."
This, of course is a conclusion of fact. Yet, in our study of the record, we have not found any proof supporting the conclusion that the crossing is not more hazardous than the Jones crossing, and there is not a scintilla of evidence to show what safety devices could be used either by the railroad or the Highway Department to lessen the dangers besetting the proposed crossing which justifies the Commission's finding that precautionary measures are available which will effectively minimize the hazards to the extent determined.
In approaching a discussion of the evidence anent the unsafeness of the crossing approved by the Commission, we are mindful of the well-settled rule of law that findings by an administrative body acting under a delegation of discretionary authority should be accorded great weight and will not be overturned by the courts in the absence of a clear showing of abuse of power. Burke v. Louisiana Pub. Serv. Com'n., 215 La. 451, 40 So.2d 916; Gulf States Utilities Co., v. Louisiana Public Serv. Com'n., 222 La. 132, 62 So.2d 250; Illinois Central R. Co. v. Louisiana Pub. Serv. Com'n., supra; Monochem, Inc. v. Louisiana Public Service Com'n., 247 La. 532, 172 So.2d 670; and Saia Motor Freight Line v. Louisiana Pub. Serv. Com'n., 248 La. 1, 176 So.2d 408. In other words, the rule is that the courts should not substitute their judgment for that of the administrative body if there is substantial evidence to support the ruling. However, if there is no evidence or the evidence is vacuous, the ruling of the body or commission must be deemed arbitrary.
The railroad's evidence before the Commission consisted in the main of the opinions expressed by highly qualified experts. The witnesses were Mr. R. J. Blair, its Vice-President and General Manager, Mr. Paul Heineman, partner in the national engineering firm of Howard, Needles, Torman and Borgendorf, who is a registered engineer in seven states, a member of the American Society of Civil Engineers, the National Society of Professional Engineers and the Institute of Traffic Engineers; Mr. Norman Ledgin, an officer of the National Safety Council and former Director of the Calcasieu Area Safety Council in Lake Charles; Mr. H. H. Hale, Assistant to the Vice-President of the Association of American Railroads in Washington, D. C.; and Mr. Frank Crane, Chief Division Engineer for defendant railroad.
*137 The testimony of these witnesses as to the grave traffic hazard which will be created by the proposed crossing stands uncontradicted. In fact, the two experts testifying for the Department, Mr. Monroe Cryar an asphalt construction engineer, and Mr. W. M. Byles, a district engineer stationed in Alexandria, candidly acknowledge that the proposed crossing will be more dangerous to the public than the one proposed at Jones Street. However, they avouch that all grade railroad crossings are hazardous and that this crossing is more suitable and preferable than the others proposed at Jones Street. However, they ramp of the expressway, which ramp would have to be relocated and rebuilt if the Jones Street crossing is used.
The issue presented does not concern so much the detriment which may be sustained by the railroad as it does the safety of the public who undertake the use of the proposed road. The record shows that vehicles exiting from the expressway would be required to cross the L & A main line track to Winnfield, a storage yard or a yard where wood pilings are now stored, a yard service road used by the industry, another storage area, a third railroad track designated as Yard Track, a fourth railroad track designated as Yard Track, another service area, a fifth railroad track designated as Yard Track, a sixth railroad track designated as side or transfer track, and finally a seventh railroad track, the L & N main line track to Shreveport.
As stated above, the witnesses unanimously voice the opinion that the contemplated service or access road over the railroad property would constitute an unsafe grade crossing. Mr. Heineman declared that he had examined the plan submitted with the documents to the Commission, and he noted six important factors which led him to the conclusion that the crossing would be unsafe.[1]
The other witnesses gave substantially the same opinion. For example, Mr. Ledgin, when asked his view with respect *138 to the safety of the general public in its use of the proposed crossing, declared:
"A. I believe we are limiting ourselves somewhat by calling this a crossing. I would like to offer as an opinion a different concept. I believe that we are paving a railroad yard so that in addition to trains it can be used by cars and children and school buses. I believe that we have here a situation where we are moving people from a residential area to their educational and recreational facilities through what can only be described as a no-man's land."
And he also stated:
"I feel that it is about the worst crossing
I have ever witnessed either in reality or in proposal * * *."
The defense witnesses also express the view favoring the Jones Street crossing. Mr. Heineman stated: "A number of the hazards that I have suggested and which I believe are real valid hazards would be minimized and some would be eliminated by a crossing of only one main line track, such as in the vicinity as Jones Street."
As we have mentioned before, the Commission concluded that the suggested Jones Street crossing was unfavorable since it would require the removal and relocation of the connecting ramp between the north bound traffic lane of the expressway and the east frontage road. However, there is no evidence showing that it is not entirely feasible to relocate the connecting ramp, albeit, obviously, it would necessitate the expenditure of additional funds by the Highway Department. But this circumstance is not in itself a valid reason for preferring the proposed crossing, particularly when the Jones Street crossing will provide the public with a safer access road from the expressway. Incidentally, there has been no showing by the Department respecting the difference in costs.
Reverting, finally, to the conclusion of the Commission that the proposed crossing would constitute no greater hazard than the Jones Street crossing, "if proper precautions be taken," we fail to find any testimony showing what type of signal could be used at this crossing which would decrease the hazard. It is true that Mr. Byles stated that, while crossing the seven tracks is more hazardous than crossing one track as the operator of a vehicle has only to look for a train on that one track, he concluded that this result would not obtain if the seven tracks are protected by signals and gates. However, the witness fails to give any consideration to the traffic delays resulting whenever the gates are closed during the many switching and other operations which the railroad is entitled to conduct over the seven tracks which have to be crossed.
For the reasons assigned the judgment of the district court is reversed. It is now ordered that there be judgment herein in favor of the Kansas City Southern Railway Company and Louisiana & Arkansas Railway Company and against defendants, the Louisiana Public Service Commission and State of Louisiana, Through the Department of Highways, annulling and setting aside Louisiana Public Service Commission Order No. 9710 and dismissing the petition of the State, Through the Department of Highways.
BARHAM, J., concurs in the result.
SUMMERS, Justice (concurring in the result reached but dissenting from the reasons assigned).
Although I agree with the result reached in this case, I do not subscribe to the Court's orbiter dictum that the main and subsidiary lines and spur tracks of the Railroad, which the Department seeks to cross at grade, are not private property or that this property may be taken for public purposes without the payment of just and adequate compensation as required by Section *139 2 of Article I of the Constitution of Louisiana.[1]
The Court's expressions on this issue are pure dicta, unnecessary for the decision of the case, based upon similar dicta found in Illinois Central R. Co. v. Louisiana Public Service Comm., 224 La. 279, 69 So.2d 43 (1953), authored by the organ of the Court in the instant case.
In arriving at the conclusion that the railroad property is not private property, the Court relies upon Section 3 of Article XIII of our Constitution where the following language is found:
"All railroads are hereby declared public highways, and every railroad company shall have the right, with its road, by expropriation, to intersect, connect with, or cross any other railroad, and shall receive and transport the others' passengers, tonnage and cars, loaded or empty, without delay or discrimination."
By the very terms of this constitutional provision declaring that railroads are public highways, expropriation is necessary to intersect, connect with, or cross any other railroad. The obvious intent of this article is to vest railroads with a "public purpose" in order that they might avail themselves of the right of expropriation, since a public purpose is essential to that right under Section 3 of Article I of the Constitution. The only other effect of the declaration that railroads are public highways is to require all railroads to receive and transport the passengers, tonnage and cars of other railroads without discrimination. The private ownership or character of railroad property is not otherwise affected. To extend this clear meaning of Article XIII, Section 3 and allow an uncompensated taking of property across the railroad's main lines, subsidiary lines and spur tracks, as the dicta of the Court suggests, is tortured reasoning contrary to the basic and fundamental constitutional protection found in Article I, Section 2.
The property taken here is 361 feet in length through private, industrial and railway property severing a ten-acre tract owned in fee by the railway company. This is no mere crossing of a railroad track or right of way. In fact, this problem is not at issue because the railroad recognizes such a crossing to be authorized by Section 841 of Title 45 of the Revised Statutes. Rather, the language of the dicta would permit the taking and damaging of other valuable fee property by a mere show cause proceeding before the Public Service Commission without resort to expropriation proceedings or the payment of any compensation.
It is, of course, elementary that the powers of the Louisiana Public Service Commission are limited to those delegated by the Constitution and laws of the State. Richland Gas Company v. Hale, 169 La. 300, 125 So. 130 (1929). While the powers of the Commission to supervise and regulate public utilities are broad and plenary, the Commission has no authority, right or power to take property of the utilities for any purpose. Such a right is absent from the constitutional provision which defines the powers of the Commission, and the right cannot be implied under any rule of reason or interpretation. See La.Const. art. 6, § 4 (1921).
"The Louisiana Public Service Commission is a public board, and not a part of the established judiciary system of the state. It is not a court, in any proper sense of that term. The power of eminent domain is not conferred upon the Commission, and it is powerless, by the adoption of any rule or regulation, to take away from the courts of this state their exclusive right to pass upon the question as to what constitutes *140 public utility and public purpose in matters of expropriation." River & Rail Terminals v. Louisiana Railway & Navigation Company, 171 La. 223, 130 So. 337 (1930). Cf. Louisiana Railway & Navigation Company v. Louisiana Public Service Commission, 165 La. 219, 115 So. 465 (1928).
The gratuitous language of the majority opinion, though not binding in future decisions, may, if permitted to stand without challenge, form the basis for future decisions, just as the dicta in Illinois Central Railway Company v. Louisiana Public Service Commission, 224 La. 279, 69 So.2d 43 (1953) formed the basis for the unnecessary and erroneous expressions in the case at bar. It is by such devices that our constitutional safeguards are eroded away. See the penetrating dissent of Mr. Justice Moise in the Illinois Central Case, ibid.
NOTES
[1] These factors referred to by the witness are set forth correctly in brief of counsel for the railroad as follows:

"(1) The approach grade to the crossing from the Expressway side is between 6/9% and 7.9%. This percentage is considered hazardous because of the limited sight distance imposed. It exceeds the normal grade and is greater than that ordinarily proposed or recommended by the Louisiana Highway Department. (Vol. 2, P. 81)
(2) The number of tracks involved increase the hazard. The fact that they are not parallel tracks but splay out requires increased perception by the driver to identify the movement of trains and their approach to the multiple crossings.
(3) The unusual width of the crossing, 361 feet from beginning to end, and even more when approaches are considered, increases the hazard because it extends the time period in which the driver is exposed to the many hazards in this area.
(4) The restrictions on sight distance after an automobile arrives at the crossing and during the crossing are excessively hazardous. These restrictions are caused by railroad cars stored up and down the tracks, trains stopped for passing and switching movements, industrial movements and, as he stated, some of these movements could conceivably be occurring while trains are using or blocking other tracks which would greatly increase the difficulty in view and increase the hazard. He noted there were also stored materials tanks and other facilities of the industry using the property in question which would increase the hazard. (Vol. 2, P. 83)
(5) The increased hazard of switching engines; Mr. Heineman pointed out that motorists can become accustomed to regular movements on main line tracks, but do not plan for random switch movements on the splayed out switch tracks.
(6) The fact that there would be an unusual number of pedestrian movements using the crossing by virtue of the playground east of the tracks. It is obvious that young children would helter-skelter hurry to and from through this railway industrial area and, being what they are, could be expected to play and roam in places of some of the greatest dangers imaginable."
[1] La.Const. Art. I, Sec. 2, provides in pertinent part: "* * * Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid."